Grace MARTINEZ, Yolanda Muro, Carmen Rayo, Olga Marines, Gabino Nunez, and Laurie Ramirez, individually and on behalf of all others similarly situated, Plaintiffs,

v.

J. Kent NYGAARD, Carl Houseman, Alan C. Nelson, John H. Colson, William B. Means, James Stenger, Michael Maloney, Charles Childers, Ronald McKinley, James H. Kimball, Crescencio De Alba, James Huffer, Pam Ferguson, Douglas Heasley, Charles W. Thompson, and Sheila Poole, individually and in their official capacities and Robert Krueger, individually, Defendants.

Civ. No. 84–380–PA.

United States District Court,
D. Oregon.

Sept. 13, 1986.

716

D. Michael Dale, Manuel Perez, Oregon Legal Services Corp., Ontario Regional Office, Ontario, Or., Philip Hornik, American Civ. Liberties Union, Portland, Or., Mark Rosenbaum, American Civ. Liberties Union, Los Angeles, Cal., Spencer M. Neal, Richard M. Ginsburg, D. Angelo Gomez, Ginsburg, Gomez & Neal, Hillsboro, Or., Ira R. Zarov, Oregon Legal Services Corp., Central Office, Portland, Or., for plaintiffs.

Charles H. Turner, U.S. Atty., Jack G. Collins, Chief, Civ. Div., Asst. U.S. Atty., Portland, Or., for defendants.

## OPINION

PANNER, Chief Judge.

Plaintiffs are United States citizens or permanent resident aliens of Hispanic origin. Defendants are Immigration and Naturalization Service (INS) employees who participated in "factory sweep" operations at plaintiffs' workplaces. Plaintiffs allege that during the sweeps they were questioned and detained in violation of the first, fourth, fifth, and ninth amendments, as well as the Immigration and Nationality Act (INA) and INS regulations. They allege that defendants conspired to violate their rights, and that INS supervisors failed to prevent this, in violation of 42 U.S.C. §§ 1985, 1986. Plaintiffs seek money damages as well as declaratory and injunctive relief.

The parties agreed to trial without a jury. I find that plaintiffs were not unlawfully questioned or detained, and find for defendants as to each of plaintiffs' claims. Plaintiffs have also moved for reconsideration of my earlier order denying class certification. I deny the motion. Each side shall bear its own costs and attorneys' fees.

## PARTIES

The sweeps took place in Ontario, Oregon at Murakami Produce Co. (Murakami) on January 25, 1984 and Gonzales Tortilleria (Gonzales) on February 9, 1984. Plaintiffs present during the Murakami sweep were Grace Martinez, Carmen Rayo, Olga Marines, and Gabino Nunez. Plaintiffs present during the Gonzales sweep were Laurie Ramirez and Yolanda Muro.

INS employees who participated in the Murakami sweep were defendants J. Kent Nygaard, John Colson, William Means, James Stenger, Michael Mahoney, Charles Childers, Ronald McKinlay, James Kimball, Cresenciano deAlba, Pam Ferguson, James Huffer, and Douglas Heasley. Most of the INS employees who participated in the Murakami sweep worked out of the Boise INS office. Four of the employees, headed by Stenger, were Border Patrol Agents from the Twin Falls, Montana Border Patrol station. Plaintiffs have dismissed their claims against deAlba, Heasley, Huffer, and Mahoney.

INS employees who participated in the Gonzales sweep were defendants Nygaard, Means, Childers, Charles Thompson, and Sheila Poole. All worked out of the Boise office.

Defendant Carl Houseman is the current District Director of the Portland, Oregon INS District Office. Defendant Robert Krueger served in this position at the time of the sweeps. Defendant Alan Nelson is the Acting Commissioner of the INS. The INS is also a defendant.

## FACT FINDINGS

*Murakami.*

The Murakami sweep took place January 25, 1984. It was led by defendant J. Kent Nygaard, a criminal investigator with the Boise INS office. Shortly before the sweep, Nygaard received information that about twenty illegal aliens were working at Murakami. Illegal aliens were known to have often worked there in the past. Nygaard obtained a search warrant, the validity of which is not at issue here.

Nygaard conducted three meetings during the two days before the sweep. The afternoon before the sweep, he conducted a short meeting with another INS officer and three clerk/stenographers from the Boise office. Two of the clerks, Pam Ferguson and Sheila Poole, are defendants here. Nygaard planned to use the clerks as matrons in the sweeps. He and the other INS officer taught them how to conduct a weapons pat down.

Nygaard conducted a second meeting later that day, attended by most of the officers who participated in the sweep. This meeting was principally a planning session. Nygaard and the others gave special attention to an INS memorandum concerning the Ninth Circuit's decision in *International al Ladies Garment Workers Union v. Sureck,* 681 F.2d 624 (9th Cir.1982), *rev'd sub nom. INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d·247 (1984). Nygaard read aloud the indented paragraphs of the memo, which detailed the requirements of the *ILGWU* injunction. While Nygaard and the others did not agree with the *ILGWU* decision, they agreed to comply with it. The Supreme Court reversed *ILGWU* about four months later. *INS v. Delgado, supra.*

Nygaard conducted a third meeting the next morning, immediately before the sweep. This meeting was attended by all INS employees who participated in the sweep. Nygaard issued assignments at this meeting, and read the *ILGWU* memo in full. Copies of the memo were also available. In keeping with the memo, Nygaard directed that officers wear civilian clothes, that guns be concealed under coats, that badges and handcuffs not be visible until used in an individual encoun-

ter, that officers not block the exits, and that they create as little disruption as possible. He also read the warrant, telling the sweep party that he had information that twenty illegal aliens were employed there.

Following the meeting, the INS employees left Boise for Ontario. Nine officers arrived in an unmarked detention van driven by Heasley, who dropped his eight passengers at the southwest corner of the building and drove off. Seven of these officers positioned themselves around the plant in order to catch fleeing workers. The officers were not visible from inside. The other two officers, Nygaard and investigator William Means, walked to the main door at the northeast corner. Outside the door they met Paul Hopper, the plant manager. Nygaard served the warrant on Hopper and entered through the main door. Means followed a few feet behind. Nygaard ordered Hopper to have the machinery shut off, to protect fleeing workers from the belts and other machinery. Hopper motioned plaintiff Grace Martinez to turn off the belts, and she did so.

Shortly after the warrant was served, two green and white INS detention vans took up positions along the northeast and southeast corners of the building. Like the officers waiting for fleeing workers, the vans were not visible to workers inside when the sweep began.

A brief description of Murakami may be helpful here. Murakami has several buildings. The building involved is a long rectangular shed used to sort and pack onions. The shed has eleven doors, which are located on each of the shed's four sides. Some of these are large garage doors used for loading and unloading trucks. There is also a covered loading dock extending from the southern end of the east side. Inside, the shed is divided into two large work areas by an east-west wall. The southern section is used for warehousing and shipping. The northern section is used for sorting onions, and contains several conveyor belts and other machines. The sorting section measures about a one hundred feet square. (*See* Appendix "A," attached.)

Three parallel sorting belts, running north-south, stand in the center of the sorting section. The only access to the sorting belts is provided by staircases that run over other belts and railings that surround the sorting area.

While Nygaard ordered that the machinery be turned off, Means walked to the jigging belt immediately to the north of the sorting belts. Two workers from the line fled. Nygaard yelled after them in Spanish, "Don't run boys, there are other officers outside." I reject the testimony by several workers that Nygaard make a general announcement in Spanish to the Murakami workers, translated as:

We are from immigration. Nobody move. The shed is surrounded.

Nygaard denied making the statement. He was an impressive witness and I accept his testimony. Many workers testified that the announcement was amplified. Nygaard had only a walkie talkie that was not able to amplify his voice. The workers who testified that Nygaard made the announcement most likely heard his command to the two fleeing workers.

Nygaard and Means questioned several workers on the jigger line, and arrested four or five of them. Legal workers were directed to stand away from the arrested workers.

A few minutes after Nygaard and Means entered the plant, Colson entered the main door. While Means remained with the arrested men who had worked on the jigger belt, Colson and Nygaard walked to the sorting belt area. Nygaard then approached the women working on the first, westernmost belt and questioned each as to her immigration status. He arrested one.

Colson stood a few feet behind Nygaard for a brief time while Nygaard began to question the women working on the first belt. Colson then walked around to the southern end of the sorting belts and climbed one of the ladder-like staircases that provided access to the second and third belts. From the top of the stairs, he displayed his badge and questioned the worker closest to him about her immigra-

tion status. After she said that she was from Mexico and had no documents, he asked her to come out of the area. All but two of the other women working on the second and third belts then followed her out. Colson backed down the ladder to let them pass. Nygaard, who had finished questioning workers on the first belt and the "number two's" belt, joined him. The two officers began to question the assembled workers about their immigration status. They arrested several workers, and detained them in the enclosed area to the south of the sorting belts until they were moved to the detention vans for transport to Boise.

After the questioning was completed, Nygaard assisted several other officers in searching the plant for workers hiding in darkened areas. He and Colson then reviewed employee time cards in the shed office, and then left for the main office building, where they spent twenty minutes reviewing employee records.

Some of the INS employees never entered the plant. Several were present in the sorting sections for short periods, however, Ferguson and some of the detention officers walked in and out of the plant in order to escort arrested workers to the detention vans outside. Most used the main door to come and go, though some of the other doors were also used.

At least one other officer entered the plant in pursuit of a fleeing illegal alien. James Stenger, a Border Patrol agent, had been posted at the west end of the shed when the sweep began. Shortly after the warrant was served, he saw about ten to fifteen workers flee the southern end of the shed, and reported this by walkie talkie to Nygaard. Stenger saw another worker run out the door and then dive back inside under a closing garage door after he saw the immigration officers posted outside. Stenger followed him into the warehouse section, arrested him, and took him to the sorting section to be held with the other detained workers. Stenger remained in the sorting section for some time after that.

Nygaard, Means, and Colson did nearly all the questioning at Murakami. Each was an INS criminal investigator with extensive experience and fourth amendment training. They did not question non-Hispanic workers. They systematically questioned Hispanic workers, though they did not question some who made a comment or joke in proficient English.

Questioning of the workers at Murakami was done in an orderly fashion. Several workers testified that the INS officers were polite. Gonzalo Argotte, a jigger belt worker, testified that he was not mistreated and that he heard no one else that day speak of mistreatment. Soccoro Flores, a sorting belt worker, testified that the officers were not mean to her or anyone else. While all of the male arrestees were frisked, only one of the female arrestees was frisked. Pam Ferguson performed this frisk.

Workers were able to walk around the inside of the plant after they had been questioned. They were able to leave the building about twenty or thirty minutes after the sweep began. Many workers treated the sweep as a break and took the opportunity to smoke a cigarette or drink a soda from the machine inside the plant. Some of the legal workers joked with the agents.

Out of about seventy-five workers at Murakami that day, about thirty were arrested. About seventy of the workers were Hispanic. The high percentage of Hispanic workers is common to agricultural work in Oregon's Treasure Valley.

Some facts are particularly relevant with regard to individual plaintiffs. The first worker Nygaard questioned on the sorting belts was Grace Martinez. She was born in this country and is a citizen. Nygaard asked her in Spanish for her papers. When she said she did not have them with her, he asked her in English where she was from. Martinez answered Blackfoot, Idaho, and asked him if she should go call her mother to get her papers. Nygaard said no, stating that she was okay, and moved to the

next worker. Martinez did not see Nygaard's gun.

Plaintiff Olga Marines worked almost directly across from Martinez on the first belt. A permanent resident alien, she has lived in the United States since she was one year old. Marines had once lost her wallet at the plant, and thereafter kept her immigration papers locked in her car in the Murakami lot while she worked. Marines became worried when she heard Nygaard ask Martinez for her papers. She asked Martinez to telephone Marines's husband to retrieve her papers. Martinez asked for permission to do so, but a second officer on the stairway, probably Colson, refused. A few minutes later, after Nygaard questioned the workers on the first belt, Martinez was able to leave the belt area. She went to the office and telephoned Marines's husband.

Marines remained between the first and second belts after she asked Martinez to phone Marines's husband. After Colson appeared on the ladder to the south, she left the belt area with the others. Colson asked her whether she had papers. Marines told him that her green card was outside in her car. Colson replied that the INS did not have time to check, took her by the arm, and led her to the area near the sorting belts where the other suspects were being held. Marines asked for permission to retrieve her papers, but Nygaard refused. Marines later attempted to leave the area to go to the phone, but Colson told her that if she moved, he would tie her hands. About fifteen to twenty minutes after Marines was placed in the area, Martinez returned with her papers and she was free to leave.

Marines asked Martinez to take her keys and retrieve her papers. Marines testified that Martinez asked an officer for permission to do so, and the officer approved. Martinez then walked to the main door, where she encountered Pam Ferguson. Ferguson asked Martinez where she was going. Martinez replied angrily that she was going outside. Ferguson stated that she could not do so until everyone had been checked. Martinez replied that she had already been checked. At some point during their argument, Ferguson grabbed Martinez by the arm and held her for a short while, perhaps thirty seconds to a minute. Stenger then approached the front door, where he saw the two arguing. Both looked over to Stenger, who told Ferguson to let Martinez go. Martinez then walked out, where she encounted another officer outside the door, who directed her to stop. After Martinez insisted that she had been checked, she was permitted to proceed.

Plaintiff Carmen Rayo is a permanent resident alien who has lived in the United States about four years. She worked between the second and third belts on the day of the raid and was questioned by Colson as to her immigration status. She answered that her green card was at home because she was afraid she might lose it, and asked to phone her husband so that he could bring it. Colson told her to wait, and placed her with the other detained workers. He later directed that she be transferred to a detention van for transport to Boise. She was released about five minutes after she was placed in the van when her husband, who had been called by another worker, brought her papers.

Plaintiff Gabino Nunez has been a permanent resident alien since 1978, and lived illegally in the United States for several years before that. He worked in the warehouse area at Murakami on the day of the raid. He was in this area when the raid began, and did not hear Nygaard make any announcement to the workers. Two of his sisters were arrested that day as illegal aliens. During the survey, he attempted to walk by detention officer McKinlay, who had entered the warehouse section. McKinlay did not believe Nunez was an illegal alien. He did, however, believe that Nunez was an alien, and that Nunez was trying to evade contact with him. McKinlay reached out and grabbed Nunez's shoulder from behind, asking him to stop. McKinlay then asked Nunez for his papers. Nunez showed him the papers and a brief

argument followed. Nunez states that he saw McKinlay's badge and gun at this time. After McKinlay left, Nunez turned on a belt machine in the warehouse. Nygaard approached him and asked him to turn the machine off. Nunez testified that he felt then that he could have left the building. Instead, he walked into the sorting section, where his sister Juana had been arrested. An officer in the sorting section then asked him for his papers, and he complied. Nunez testified in his deposition that the second officer "treated [him] right." Nunez then saw that his sister had been arrested, and eventually left the shed.

*Gonzales.*

The Gonzales Tortilleria has two main buildings. An office and a bathroom are in one building. The tortilla plant is in a second building. The plant building has seven or eight windowless doors to the outside. Access to some is made difficult by belts and machinery located inside the doors. Inside the plant are several partitions, a corn tortilla line, a flour tortilla line, and several tables and other work stations. (*See* Appendix "B," attached.)

Planning for the Gonzales sweep began after an informant tipped the INS that several illegal aliens were working there. Nygaard, who was also in charge of the Gonzales sweep, conducted an informal meeting on the morning of the sweep at a pancake house in Boise. Investigator Charles Thompson, Means, detention officer Charles Childers, and Sheila Poole were present. They discussed the layout of the plant and planned various assignments. Nygaard summarized the *ILGWU* memo.

The INS employees arrived at Gonzales around 6:30 a.m. in two unmarked vehicles. Childers, Thompson, and Means took up positions outside so that they could apprehend workers who fled after Nygaard entered. At the same time, Nygaard approached the main door, which was marked "No Admittance." Poole, who was directed to refer all questions to Nygaard, accompanied him.

Nygaard and Poole encountered plaintiff Laurie Ramirez at the door. She is a United States citizen who has lived in this country for twenty-two years. Ramirez was outside the main door dumping garbage when the INS arrived. Nygaard asked her where the owner was, and entered the door. Ramirez alleges that Poole then grabbed her by the arm and pushed her inside. Ramirez has not met her burden of showing that this occurred. Poole denied that she grabbed Ramirez. Nygaard, Poole, and plaintiff Yolanda Muro all testified that Nygaard entered the plant first, and that Poole followed a few minutes later. This conflicts with Ramirez's version, which is that Nygaard followed Poole as she pushed Ramirez into the plant. Muro also testified at her deposition that she did not remember seeing Ramirez when Poole entered.

After Nygaard entered the plant, he asked Muro where the boss was. She summoned the owner, Don Gonzales. Nygaard identified himself and asked to search the plant. Gonzales reluctantly consented to the search. The validity of his consent is not in issue here.

Nygaard then questioned most of the Hispanic workers. They testified that his questions were polite. He made several arrests, handcuffing the arrestees and leading them around as he questioned other workers. He later instructed the arrestees to sit down in a group on some flour sacks. Nygaard did not request that the tortilla lines be shut down, as he did not believe they posed a hazard to fleeing workers.

A few minutes after the sweep began, Childers entered the plant through another door and questioned at least one Hispanic worker. Means entered the plant through the main door a few minutes later, bringing an arrested worker with him. Means had questioned the worker outside the plant. The worker had attempted to flee, knocking Means to the ground. Thompson apprehended him and turned him over to Means. After escorting the worker inside, Means questioned at least one Hispanic who worked inside the plant. About ten minutes later, Thompson entered the plant

through the main door, questioned one or two workers, and escorted arrested workers to the detention van.

After the questioning was finished, Nygaard searched the plant for workers who had hidden inside. He found one hiding under a corn tub in the rear of the plant, and arrested him.

After Ramirez reentered the plant, she went back to work on the flour tortilla line, replacing an arrested worker. She says she heard Nygaard make a general announcement not to move, but I do not accept this. Nygaard denied making such a statement, and I accept his testimony. Nygaard did not question Laurie Ramirez. Childers, however, did ask her in Spanish for her name. She answered and he had no further questions. Ramirez resumed working, but became uncomfortable and wanted to go to the bathroom. She walked to the main door, where Poole had stood since the operation began. Ramirez asked to leave the plant so that she could go to the bathroom, which was located in the next building. Poole referred her to Nygaard. Ramirez then walked to Nygaard, who was near the rear of the plant. He said she could go out, and she did so, leaving by another door. I reject Ramirez's testimony that she asked Poole twice to go to the bathroom and that Poole refused both times without referring Ramirez to Nygaard. Yolanda Muro testified that she heard Poole refer Ramirez to Nygaard.

Plaintiff Yoland Muro is a United States citizen who has lived here all her life. Nygaard questioned her as she worked on the flour line. He told her he was from immigration, and asked her for her name and where she was from. She answered and he moved to the next worker.

Muro was able to walk around the plant, though Nygaard directed her to stay away from the arrested workers. She was upset by the sweep and wanted to leave the plant, but did not. While she testified that she did not feel free to do so, she also testified that she had heard Poole refer Ramirez to Nygaard for permission to go outside. She felt she could also ask him for permission, but did not do so.

Muro did not hear Nygaard make a general announcement. She did not see his badge, but did see his gun when his coat opened. She also saw his handcuffs and saw his flashlight hanging from the back of his belt, and mistook it for a nightstick. She testified that no INS agent touched her and that Nygaard was polite towards her. She did not see INS agents posted at the doors of the plant, and like the other workers, she could not see outside.

About thirty persons were working at Gonzales on the day of the sweep. All but one were Hispanic. Eight illegal aliens were arrested. INS agents were present in the plant no more than thirty minutes. Questioning of the workers lasted about fifteen to twenty minutes. All of the arrested workers were taken out of the plant in another ten minutes. Nygaard and Thompson then went to the office building, where they spoke with Mr. and Mrs. Gonzales, the plant owners, for about forty-five minutes.

Work stopped for about two and a half hours because of the sweep. During the sweep Mr. Gonzales directed that the flour and corn lines be turned off, primarily because he did not have enough workers to run them after the arrests began. The mixture in the machines later hardened. After he returned from his discussion with Nygaard, Gonzales ran off a new batch and work resumed. As at Murakami, none of the plaintiffs lost any wages because of the work stoppage.

The parties stipulate that the INS employees did not wear uniforms at Murakami and Gonzales, did not wear badges but displayed them to individual workers during questioning, and that handcuffs were not visible until used on arrested workers. Nygaard, Stenger, and another officer carried walkie-talkies at Murakami, but there is no evidence that any of the officers carried a walkie-talkie at Gonzales.

The parties also stipulate that no guns were drawn at either plant. Most workers saw no guns, but some did. There was

some testimony that INS officers wore their guns in "high rise" holsters, which allowed the guns to ride above the waist, where they would be concealed by the officers' jackets. Guns may have been visible, however, under the short waisted ski and Levi type jackets worn by some of the officers, as well as when an officer opened or lifted his coat to reach for his handcuffs. Only full-time INS officers wore guns. Huffer, Heasley, Ferguson, and Poole did not.

None of the officers carried nightsticks at either location. Many, however, carried black flashlights common to law enforcement. Some workers mistook these for nightsticks. Poole and Ferguson did not carry badges, handcuffs, or flashlights.

## DISCUSSION

The central issue here is whether plaintiffs' fourth amendment rights were violated by the sweeps at Murakami and Gonzales. Whether this occurred is governed by two questions: (1) whether plaintiffs were seized within the meaning of the fourth amendment, and (2) whether the seizure was reasonable under the circumstances.

The first question is generally governed by the standards stated in Justice Stewart's opinion in *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).

[A] person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*See also United States v. Anderson*, 663 F.2d 934, 939 (9th Cir.1982).

The Supreme Court applied this test in the immigration context in *INS v. Delgado, supra.* In that case, the Court held that workers were not seized individually or as a group by INS agents conducting factory sweeps at large garment plants. The agents displayed badges, carried walkie talkies, and wore guns, although they never drew them. Agents were posted at each exit. Others moved systematically through the factory, approaching most workers, and after identifying themselves as INS agents, asked the workers from one to several questions regarding their immigration status. If a worker gave a credible reply that he was a citizen, the questioning ended, and the agent moved on. If the worker's answer was not credible or if he admitted that he was an alien, he was asked to produce his immigration papers.

Some disruption occurred during the sweeps, as some workers fled when the INS entered the plants. The surveys lasted from one and a half to two hours. Fifteen to twenty-five agents were involved in each survey, which occurred at large plants employing up to 300 persons. Illegal aliens were handcuffed in the plants and led away.

The district court granted the defendants' motion for summary judgment. The Ninth Circuit reversed, holding that the sweeps constituted a seizure of the work force and that the questioning violated the fourth amendment unless it was based on a reasonable suspicion that the worker questioned was an illegal alien. The Supreme Court reversed. The entire Court, save Justice Marshall, who did not participate, agreed that there was no continuing seizure of an entire workforce during the sweeps.

The majority also held that individual workers were not seized, holding that the questioning and requests for papers constituted "classic consensual encounters" rather than fourth amendment seizures. The majority found that workers were not otherwise detained, stressing that workers were not prevented from moving about the

factory during the sweeps and were free to continue working. The Court also reasoned that the stationing of INS agents at exit doors should not have led workers who were citizens or legal aliens to believe they were not free to leave the plants, as they should have realized that they could leave after brief questioning at the exits.

Under the seizure test articulated in *Delgado*, "[u]nless the circumstances of the encounter are so intimidating as to demonstrate that a reasonable person would have believed that he was not free to leave if he had not responded, one cannot say that the questioning resulted in a detention under the Fourth Amendment." 104 S.Ct. at 1763. If, however, "the persons [sic] refuses to answer and the police take additional steps ... to obtain an answer, then the Fourth Amendment imposes some minimal level of objective justification to validate the detention or seizure." *Id., citing Mendenhall, supra; Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968).

█ *Delgado* controls here. While some of the facts here go beyond those in *Delgado*, the sweeps here were generally far less intrusive than those in *Delgado*. This resulted largely because the officers made a good faith effort to comply with the *ILGWU* injunction.

The sweeps here were shorter in duration than those in *Delgado*, particularly at Gonzales. No officers were posted at exits at Murakami or Gonzales, and the officers waiting outside were not visible from inside. Officers did not wear uniforms. Their guns were under their coats and many workers, including all but two of the plaintiffs, did not see them. A small number of INS employees were inside the plants during the sweeps, and questioning was done by an even smaller number of INS officers. Nygaard's yell to the two fleeing workers at Murakami was not a command to the workforce. No general announcement was made at Murakami or Gonzales. Given these facts, I can only conclude that, as in *Delgado*, there was no continuing seizure of either workforce.

Plaintiffs argue that defendants could have conducted the operations in a less intrusive manner by making use of the lists of named suspects. The lists proved incomplete; there were more illegal aliens at each plant than the INS had full names. Even if the INS had asked to speak with or announced the names of suspected illegal aliens at each plant, these workers might well have fled or remained silent, resulting in the same disruptions and questioning that occurred here.

Most of the individual plaintiffs were not detained. At Murakami, Martinez and Nunez were not seized within the meaning of the fourth amendment. The questioning of Martinez by Nygaard and other INS employees did not constitute a fourth amendment seizure. *Delgado*, 104 S.Ct. at 1762–64. The request that she remain on the first belt until questioning was completed was not a seizure, nor was her altercation with Ferguson or her brief encounter with the detention officer outside.

The cumulative effect of these encounters did not rise to the level of a fourth amendment seizure. Martinez was free to move about the Murakami shed shortly after she was questioned, and was able to make at least one phone call from the shed office shortly after she was questioned. She was also able to go outside to retrieve Marines's papers without significant difficulty.

Even if I could find that these *de minimis* encounters constituted fourth amendment seizures, I would find them reasonable under the circumstances here. *See Delgado*, 104 S.Ct. 1765–67 (Powell, J., concurring). Given the Supreme Court's apparent approval of factory sweeps in *Delgado*, the courts should allow the INS to take reasonable steps to ensure that the sweeps proceed smoothly and that illegal aliens do not slip away. The brief encounters Martinez experienced, while irritating, were necessary to maintain some order at Murakami so that questioning could be completed quickly and disruptions minimized.

Nunez was not seized within the meaning of the fourth amendment. While McKinlay did grab him by the shoulder, every touch does not transform an encounter into a constitutional tort. Nunez produced his papers at McKinlay's request. He testified that McKinlay did not hurt him and that he was not afraid of him. After the questioning by McKinlay, Nunez felt free to go outside, and eventually did so.

Even if Nunez was temporarily detained within the meaning of the fourth amendment, the seizure was reasonable under the circumstances. In *ILGWU*, the Ninth Circuit held that to detain a worker short of arrest, an INS officer must have a reasonable suspicion that the particular worker is an illegal alien. The Supreme Court did not reach this issue in *Delgado*, and subsequent decisions indicate that this requirement is still the law of the Circuit. *E.g., Nicacio v. INS*, 797 F.2d 700, 702 (9th Cir.1985); *Benitez-Mendez v. INS*, 752 F.2d 1309, 1311 (9th Cir.1984). McKinlay admitted that he did not have a reasonable suspicion that Nunez was an illegal alien. Nevertheless, I cannot find the short lived detention here unreasonable. McKinlay questioned Nunez for only a minute or two. Nunez himself testified that nine warehouse workers fled shortly before McKinlay grabbed him. Given the confusion this must have caused, as well as Nunez's evasive demeanor, McKinlay's behavior was reasonable.

Ramirez and Muro were not detained at Gonzales within the meaning of the fourth amendment. While Ramirez's exit was slowed when Poole referred her to Nygaard for permission to leave the building, Ramirez had no reason to believe she was not free to leave after speaking with him, and in fact left the building.

After Muro heard the exchange between Poole and Ramirez, she reasonably should have believed she was free to go. She believed that she could ask Nygaard for permission to leave. She failed to do so, even though she heard Poole refer Ramirez to Nygaard and did not see Ramirez inside the plant during the remainder of the

sweep. Before she heard this, she may reasonably have believed that she was not free to leave. Even if such a detention occurred, it does not rise to a constitutional level. The detention was extremely short lived and reasonable under the circumstances.

█ I need not decide whether the INS had a particularized suspicion to detain Muro during the short period before she was questioned. The effect of *Delgado* is that no particularized suspicion is necessary during the time before individual questioning occurs. I do not reach a contrary result given the Court's apparent approval of factory sweeps, and given that the Gonzales sweep was less intrusive than those in *Delgado*.

Muro testified that Nygaard's questions were polite. He was available to answer questions, and allowed Ramirez to leave when she asked to do so. There is no evidence that he would have any reason to refuse to allow Muro to do likewise. Poole's conduct in referring Ramirez to Nygaard was also reasonable. While plaintiffs might argue that the INS should use only experienced officers on factory sweeps, I am unwilling to place such a weight on an already overburdened agency. Like Ferguson, Poole was instructed to refer all questions to Nygaard, and there is evidence that she did so.

█ Rayo and Marines were seized within the meaning of the fourth amendment, but the seizures were reasonable and did not violate the fourth amendment. There is no question that they were detained after Colson took each by the arm and placed them with a group of detained suspects. Nygaard and Colson also refused them permission to get their papers or telephone others who could bring them.

Police may briefly detain a suspicious individual to determine her identity or maintain the *status quo* while making appropriate inquiries, so long as the force displayed is not excessive under the circumstances. *Terry v. Ohio, supra; United States v. Patterson*, 648 F.2d 625, 633 (9th

Cir.1981). An articulable suspicion of criminal conduct provides an adequate basis for such a seizure. *Id.* Police must, of course, have probable cause before making an arrest.

Defendants concede that both Marines and Rayo were detained, but contend that neither was arrested. Whether the seizure of either crossed the line between a *Terry* stop and an arrest "depends on all the surrounding circumstances, including the extent that freedom of movement is curtailed and the degree of force used to effectuate the stop." *United States v. Harrington,* 636 F.2d 1182, 1186 (9th Cir.1981). The test is whether, under all of the circumstances, a reasonable person would conclude that she was under arrest. *Patterson,* 648 F.2d at 632. The degree of force used and the extent to which freedom of movement is curtailed are relevant factors. *Id.* Length of the stop is also important, but should be considered in light of the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes. *United States v. Sharpe,* 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (twenty minute detention constituted reasonable *Terry* stop and was not an arrest when police acted diligently and suspect's actions contributed to added delay).

■ Though Marines was detained, she was not arrested. She was held for about ten to fifteen minutes with the other detained workers. She knew that she was being detained because she did not have her green card with her. She also knew that Martinez was going out to retrieve her papers and had heard Stenger give Martinez permission to do this. A reasonable person in her position would believe she was detained, but not arrested. Colson's warning that he would tie Marines's hands if she moved out of the area where detained workers were being held did not transform the seizure into an arrest, as he said this only in response to Marines's attempt to leave the area.

■ Marines's detention was reasonable, as it was based on a reasonable suspicion that she was an illegal alien. While neither Colson nor Nygaard remember detaining Marines, both testified that a common ploy by illegal aliens is to tell INS officers that their papers are in their car or at home. All green cards warn that the bearer should carry it within her personal possession at all times. Failure to do so violates 8 U.S.C. § 1304(e).

Marines's obvious violation of the green card statute gave the officers a second basis for detaining her. While her failure to carry the card may be understandable given her fear of losing it again, INS officers should not be made responsible for this. It was reasonable to detain her until a co-worker could retrieve her papers, rather than detail an INS employee to do so during the middle of a sweep. I reject plaintiffs' argument that Marines did not violate the green card statute because her papers were in her "constructive possession." In *Benitez-Mendez,* the Ninth Circuit held that a field worker's papers were in his constructive possession when he left them in his car, which was parked adjacent to the field where he engaged in heavy agricultural labor. 752 F.2d at 1312 n. 2. This case is distinguishable. Plaintiffs worked inside a plant rather than out in a field. The labor was not as hot and heavy as in a field, thus Marines could have carried the papers on her person, as required by the message printed on the back of the card and by the plain terms of the statute. Many workers at Murakami complied with this simple instruction. Marines's fourth amendment rights were not violated.

■ I agree with plaintiffs that Rayo was arrested, though I find the arrest reasonable. After being held inside with the other arrested workers for at least fifteen to twenty minutes, Rayo was taken to an INS detention van and placed inside for about five minutes. In *United States v. Moore,* 638 F.2d 1171, 1174–75 (9th Cir. 1980), *cert. denied,* 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981), the Ninth Circuit held that placing suspects into the caged rear seat of a police car did not convert an investigatory stop into an arrest

when the suspects were informed they were just being detained until customs officials arrived. This case is distinguishable. Taking Rayo to the van and placing her inside altered the *status quo* sufficiently to convert her detention into an arrest. There is no evidence that Rayo was told that she would be held in the van until the INS could determine whether she had her papers, and Rayo reasonably believed that she would be driven to Boise with the other arrestees.

■ Rayo's arrest was appropriate, however. Colson and Nygaard had probable cause to believe that Rayo had violated section 1304(e), the green card statute. I reject plaintiffs' argument that the INA does not give INS officers the authority to arrest aliens who commit misdemeanors like this. I cannot conclude that Congress did not intend to allow INS officers to arrest aliens who commit misdemeanors under the INA. The Ninth Circuit has not directly addressed this issue, but previous opinions support this position. *United States v. Ritter*, 752 F.2d 435, 437–38 (9th Cir.1985); *Benitez-Mendez*, 752 F.2d at 1312 n. 2.

Plaintiffs argue that Rayo was not really arrested for violating the green card statute, in that she was released after her husband brought her green card to the van and because she was never cited for failing to carry it. Both Rayo and Marines testified, however, that Colson admonished them for failing to carry their green cards. I will not penalize defendants for releasing either Rayo or Marines after they belatedly produced their cards. The officers had probable cause to arrest because of the failure to carry the cards. Rayo's arrest was therefore legal. If Marines had been arrested, I would reach the same result.

■ Plaintiffs also argue that these detentions were not reasonable because Nygaard and Colson could not recall the specific reasons they had for detaining Rayo and Marines. While officers must have a particularized suspicion of illegal alienage to detain and probable cause to arrest, this does not mean that the officer should be required to recall the precise basis for every detention. The Supreme Court recently recognized the futility of such a requirement in *INS v. Lopez-Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 3490, 82 L.Ed.2d 778 (1984).

Immigration officers arrest over one million deportable aliens in this country every year ... a single agent may arrest many illegal aliens every day.... The officers cannot be expected to compile elaborate, contemporaneous, written reports detailing the circumstances of every arrest.... INS arrests occur in crowded and confused circumstances. Though the INS agents are instructed to follow procedures that adequately protect Fourth Amendment interests, agents will usually be able to testify only to the fact that they followed INS rules. The deamdn for a precise account of exactly what happened in each particular arrest would plainly preclude mass arrests, even when the INS is confronted, as it often is, with massed numbers of ascertainably illegal aliens, and even when the arrests can be and are conducted in full compliance with all Fourth Amendment requirements.

*Lopez-Mendoza* is distinguishable, as the Court was faced with the question of whether the exclusionary rule should apply in deportation cases. Nevertheless, its reasoning applies with equal force here.

Plaintiffs have not argued the substance of their first, fifth, and ninth amendment claims. While the Court in *Delgado* did not deal with such claims, the Court's general approval of factory sweeps convinces me that these claims have no merit absent unusual circumstances. None exist here.

Plaintiffs also seek relief under the INA and INS regulations promulgated under it. First, they allege that defendants questioned them without having an appropriate basis for doing so. Section 287(a)(1) of the INA provides:

(a) Any officer or employee of the Service authorized under regulations

prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States.

8 U.S.C. § 1357(a)(1).

■ The Court in *Delgado* implicitly decided this issue when it held that mere questioning need not be based on a particularized suspicion of alienage. The Court's opinion discusses this issue in light of the fourth amendment, and does not mention section 1357(a)(1). The Ninth Circuit had held below, however, that section 1357(a)(1) required a particularized suspicion of alienage for questioning. This issue was thoroughly briefed to the Supreme Court and the Court's reversal of *ILGWU* can only mean that section 1357(a)(1) does not require a particularized suspicion of alienage for mere questioning.[1] At least one subsequent decision by the Ninth Circuit is in accord. *Zepeda v. INS,* 753 F.2d 719, 725–26 (9th Cir.1985); *but see LaDuke v. Nelson,* 762 F.2d 1318, 1327 (9th Cir.1985).

Plaintiffs correctly point out that M–69, the INS handbook on search and seizure policy, required at the time of the sweeps that questioning be based on a particularized suspicion of illegal alienage. The *Delgado* opinion, issued after that version of the M–69 was published, shows that the INS interpreted section 1357(a)(1) too strictly. Plaintiffs have no right of action, moreover, for violations of the policies described in M–69.

■ Plaintiffs also allege that Nygaard violated the INA and INS regulations by failing to obtain an arrest warrant before making the arrests at Murakami and Gonzales. They point out that section 287(a)(4)

and M–69 permit a warrantless search only if the officer reasonably believes that the suspect is likely to escape before a warrant can be obtained. While Nygaard did not obtain arrest warrants for the suspected illegal aliens at Murakami or Gonzales, plaintiffs may litigate only what happened to themselves. They do not have standing to challenge the warrantless arrests of illegal aliens.

■ Rayo was the only plaintiff arrested. While Nygaard and Colson do not remember the arrest, both testified that illegal aliens sometimes say that their papers are at home or someplace else. Several aliens had fled Murakami that day and it would be reasonable for them to conclude that Rayo might also flee if she was not detained. After her papers did not arrive, it was reasonable to arrest her and have her transported to Boise with the others, rather than delay the group's departure any longer. Rayo's warrantless arrest was not illegal.

■ Plaintiffs' claims under 42 U.S.C. §§ 1985(3) and 1986 also fail. The elements of a section 1985(3) claim are:

(1) a conspiracy, (2) to deprive any person or a class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) an act by one of the conspirators in furtherance of the conspiracy, and (4) a personal injury, property damage or a deprivation of any right or privilege of a citizen of the United States.

*Gillespie v. Civiletti,* 629 F.2d 637 (9th Cir.1980). There is no evidence of a conspiracy here and I find that none occurred. That INS officers questioned and detained only Hispanic individuals was not improper

---

1. Defendants argue that the word "interrogate" as used in section 1357(a)(1) does not include mere questioning. Instead, they argue, interrogate should be interpreted to require detentive questioning that involves a fourth amendment seizure. Thus the statute would not require a reasonable suspicion of alienage for mere questioning. While this argument is appealing, a problem remains. The Ninth Circuit, like several other courts, interprets the fourth amendment as requiring that detentive questioning be

based on a reasonable suspicion of alienage *plus* unlawful presence. *LaDuke,* 762 F.2d at 1357; *Benitez-Mendez v. INS,* 760 F.2d 907, 909; *ILGWU,* 681 F.2d F.2d at 635–39; *rev'd on other grounds,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247; *but cf. Zepeda,* 753 F.2d at 725–26. Section 1357(a)(1) appears to allow detentive questioning based on a reasonable suspicion of alienage *alone.* Thus it might be unconstitutional. I need not decide this issue, however, because plaintiffs have not raised it.

under the circumstances here. The INS expected to find a large number of illegal aliens at both worksites. This was consistent with past experience in the Ontario area. There was no indication that illegal aliens from countries other than Mexico would be found. Plaintiffs' rights were not violated by the sweeps. Thus plaintiffs do not state a claim under section 1985(3).

■ Plaintiffs also seek damages against Nygaard and Stenger for violations of section 1986. Stenger is named as he headed the Border Patrol contingent that assisted at Murakami. Section 1986 provides for recovery of damages against persons who, having the knowledge and power to do so, fail to prevent the commission of a conspiracy pursuant to section 1985. Section 1986 derives from section 1985. There can be no claim under section 1986 unless there is also a valid claim under section 1985. *Mollnow v. Carlton,* 716 F.2d 627, 632 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1595, 80 L.Ed.2d 126 (1984). As plaintiffs' section 1985 claim is not meritorious, their section 1986 claim also fails.

■ Plaintiffs also move for reconsideration of my order denying class certification. I deny the motion. Before trial, plaintiffs moved for certification of a class consisting of "all persons of Hispanic ancestry who are, will be, or have been employed in any business in the District of Oregon." Plaintiffs now seek certification of a class of "all individuals of Hispanic ancestry who were employed at Murakami Produce or Gonzales Tortilleria factory at the time of the factory sweeps complained of in this lawsuit or will be employed at those establishments in the future."

I apply the standards cited in my opinion of November 29, 1984. Certification of this class would not be appropriate given my finding that there was no continuing seizure of either workforce. Plaintiffs' suggested class would include illegal and legal aliens, as well as citizens. The claims of legal and illegal workers are so different as to make certification of this class inappropriate. Legal and illegal workers will have far different perceptions as to whether INS officers' actions resulted in their detention. Defendants also argue that they would be prejudiced by certification of any class at this point, as they based their trial strategy on my pretrial ruling that this case would not proceed as a class action. I agree. Plaintiffs' motion for reconsideration is denied.

Both sides have moved for costs and attorneys' fees. Because substantial issues were raised in good faith by each side, I will not award defendants costs.

## CONCLUSION

I find for defendants as to each of plaintiffs' claims. I deny plaintiffs' motion for reconsideration of my order denying class certification. Each side shall bear its own costs and fees. This opinion constitutes findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

**APPENDIX A – MURAKAMI PRODUCE CO. SHED**

(Plaintiffs' Exhibit 1 – Illustrative Markings added by witnesses and the court)

732

(Plaintiffs' Exhibit 2)

