Grace MARTINEZ, Yolanda Muro, Carmen Rayo, Olga Marines, Gabino Nunez, and Laurie Ramirez, individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

J. Kent NYGAARD, Carl Houseman, Alan C. Nelson, John H. Colson, William B. Means, James Stenger, Michael Maloney, Charles Childers, Ronald McKinley, James H. Kimball, Crescencio DeAlba, James Huffer, Pam Ferguson, Douglas Heasley, Charles W. Thompson and Sheila Poole, individually and in their official capacities and Robert Krueger, individually, Defendants-Appellees.

No. 85-4327.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 7, 1987.

Decided June 23, 1987.

D. Michael Dale, Portland, Or., Mark Rosenbaum, Los Angeles, Cal., for plaintiffs-appellants.

Craig J. Casey, Portland, Or., for defendants-appellees.

Before GOODWIN and THOMPSON, Circuit Judges, and LYNCH,* District Judge.

GOODWIN, Circuit Judge:

Grace Martinez, a United States citizen, and three resident aliens sued defendants, Immigration and Naturalization Service (INS) agents, alleging that the agents violated their first, fourth, fifth and ninth amendment rights during a "factory sweep" of their workplace, Murakami Produce Company, in Ontario, Oregon. Plaintiffs sought damages and declaratory and injunctive relief. They challenged both the warrant authorizing the entry and the individual questioning that took place after the entry. On defendants' motion for summary judgment, the district court held that plaintiffs lacked standing to challenge the warrant and granted partial summary judgment to defendants. Sitting without a jury, the court then tried the remaining claims based upon unlawful detention, and held that the plaintiffs were not detained in violation of the fourth amendment. Plaintiffs appeal.

In 1984 the INS began receiving tips from a variety of sources that Murakami Produce Company in Ontario, Oregon, was employing illegal aliens. The INS obtained a search warrant for Murakami's plant, and on January 25, 1984, nine INS agents [1] conducted a "survey" of the factory.[2]

The district court's opinion describes the sweep in detail. *See Martinez v. Nygaard,* 644 F.Supp. 715 (D.Or.1986). Briefly,

Agent J. Kent Nygaard led a team of INS agents to the Murakami plant. After showing a search warrant to the plant manager, Nygaard and another agent were admitted to the plant. Several more agents followed them into the plant, while others remained outside and watched the exits.

At Nygaard's request, the manager shut down the machinery so that questioning could proceed at a conversational level. The agents inside the plant systematically questioned workers who appeared to be of Latin American ancestry, asking them for proof of legal residence. The agents did not display their guns during the questioning or bar the exits. Badges and handcuffs were visible only when used to detain specific aliens not parties in this appeal.

Agent Nygaard approached plaintiff Grace Martinez, an American citizen, and asked her in Spanish for her papers. Martinez responded that she had none, and told Nygaard that she was from Idaho. Nygaard then moved on. Plaintiff Olga Marines, a permanent resident alien, worked directly across from Martinez. Because she kept her immigration papers locked in her car, Marines became worried when she heard Nygaard ask Martinez for papers. Marines asked Martinez to telephone her husband to retrieve her papers. An INS agent, not Nygaard, at first prevented Martinez from leaving the belt area, but let her go a few minutes later when all the workers in her work area had been questioned.

Agent Colson asked Marines for her papers. Marines replied that her papers, were outside in her car. Colson refused Marines permission to go to her car and, taking her by the arm, led her to an area where other suspected aliens were being held. Marines later tried to leave the area to use the telephone, but stopped when

---

* Honorable Eugene F. Lynch, United States District Judge, Northern District of California, sitting by designation.

1. Not all the INS employees who went to Murakami were official agents of the INS. However, because the official titles make no difference to our analysis, we refer to them all as INS agents.

2. At about the same time, INS agents conducted a similar survey at Gonzales Tortilleria, in Ontario. This action originally included claims arising out of that incident. On appeal, however, only the claims arising from the Murakami sweep remain.

Colson warned her that if she moved again he would tie her hands.

Marines then asked Martinez to take her keys and retrieve her papers. Martinez walked to the main door where she encountered Pam Ferguson, another INS agent. Ferguson asked Martinez where she was going and told her she could not go outside until everyone had been checked. Martinez replied angrily that she had already been checked. An argument ensued, following which Ferguson grabbed Martinez by the arm and held her for at least thirty seconds. Ferguson let go only when another agent signaled that Martinez could go outside. Once free of Ferguson, Martinez went to the parking lot. She was stopped yet again by another agent, but was allowed to proceed after she insisted that she had been checked. She fetched Marines' papers and Marines was released.

Agent Colson questioned plaintiff Carmen Rayo, a permanent resident alien, and asked her to produce her papers. Rayo replied that her papers were at home and asked permission to telephone her husband, who could bring them to the factory. Colson refused the request and placed Rayo in the part of the plant reserved for detained workers. He later sent her to a detention van for transport to Boise. After Rayo had sat five minutes in the van, her husband, who had been summoned by her co-worker, arrived with her papers. She was released.

Plaintiff Gabino Nunez, a permanent resident alien, happened to walk past Agent McKinlay during the survey. McKinlay, suspecting that Nunez was trying to avoid him, grabbed his shoulder from behind and asked him to stop and show his papers. Nunez showed him the papers and, after a brief argument, McKinlay left to question another worker.

**3.** On appeal, the plaintiffs have dropped all claims except those based on the fourth amendment. It is not clear whether they have also dropped all claims for equitable and declaratory relief, but in any case, we hold they have no standing to seek either. Individuals seeking injunctive relief must show they are in immediate danger of sustaining direct injury as a result of the challenged official conduct. *City of Los Angeles v. Lyons,* 461 U.S. 95, 101–02, 103 S.Ct.

## DISCUSSION

### I. Standing to challenge warrant [3]

■ The district court held that plaintiffs lacked standing to challenge the search warrant as they had no legitimate expectation of privacy in their workplace. We agree.

■ Fourth amendment rights may not be vicariously asserted. *Rakas v. Illinois,* 439 U.S. 128, 133–34, 99 S.Ct. 421, 425–26, 58 L.Ed.2d 387 (1978). To establish standing to challenge the search warrant, Martinez and the other workers must show that the warrant violated their personal rights, not merely the rights of Murakami's owners or managers. To make this showing, plaintiffs must prove that they had a legitimate expectation of privacy in the area searched or the things seized. *Id.* at 143, 99 S.Ct. at 430; *United States v. Salvucci,* 448 U.S. 83, 91–92, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980); *United States v. Nadler,* 698 F.2d 995, 998–99 (9th Cir.1983). In *Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968), the Court found that a union official had a legitimate expectation of privacy in an office he shared with several other officials. The office had a door, and except for union higher-ups and fellow occupants, the official was able to exclude others. *Id.* at 368–69, 88 S.Ct. at 2123–24.

■ In this case, plaintiffs worked in a large two-room shed that contained 75 people. Unlike the defendant in *Mancusi,* the workers had no private space in any part of the building, and no authority to exclude others. They had no possessory interest in the place searched or things seized, and no right to exclude others from the premises. Thus, plaintiffs had no reasonable expectation of privacy in their workplace.

1660, 1664–65, 75 L.Ed.2d 675 (1983). The same standard applies to those seeking declaratory relief. *Gonzales v. City of Peoria,* 722 F.2d 468, 480–81 (9th Cir.1983). Because plaintiffs have failed to show that they personally are likely to suffer again from the same allegedly unconstitutional conduct, they lack standing to seek equitable or declaratory relief. *See INS v. Delgado,* 466 U.S. 210, 218 n. 6, 104 S.Ct. 1758, 1764 n. 6, 80 L.Ed.2d 247 (1984).

The INS agents relied on the warrant only to enter the factory, not to justify their questioning and detention of its occupants. The INS questioning and detention will be dealt with separately under the standards applicable to warrantless encounters. We hold that because the warrant's purpose and effect were solely to authorize entry, not questioning, the warrant itself did not invade any privacy rights of plaintiffs. Accordingly, plaintiffs have no standing to challenge the warrant.

## II. Did a seizure occur in violation of the fourth amendment?

■ We review *de novo* an ultimate holding that there was, or was not, a seizure in violation of the fourth amendment. *United States v. Sokolow,* 808 F.2d 1366, 1369 (9th Cir.1987); *LaDuke v. Nelson,* 762 F.2d 1318, 1327 (9th Cir.1985). The findings of the historical facts are, of course, reviewed under the clearly erroneous standard, Fed.R.Civ.P. 52(a), but the legal consequences of those facts are questions of law. *United States v. Attardi,* 796 F.2d 257, 259 (9th Cir.1986); *United States v. McConney,* 728 F.2d 1195, 1200–05 (9th Cir.) *cert. denied,* 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).

With regard to each of the four plaintiffs, we must decide (1) whether he or she was subjected to a fourth amendment seizure, and if so, (2) whether the seizure was reasonable.

### A. *Nunez*

Nunez alleges that he was unlawfully seized when the INS agents grabbed him by the shoulder in order to get him to answer questions. The district court held that although an agent did grab Nunez, he held him so briefly that any detention did not amount to a fourth amendment seizure. We agree.

■ A person has been seized within the meaning of the fourth amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *United States v. Erwin,* 803 F.2d 1505, 1508 (9th Cir.1986); *United States v. Patino,* 649 F.2d 724, 727 (9th Cir.1981). "[C]ircumstances that might indicate a seizure, even where the person did not attempt to leave, [include] the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *United States v. Anderson,* 663 F.2d 934, 939 (9th Cir.1981), quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.).

In determining whether a seizure occurred in the context of immigration "surveys" of factories, we look to *Delgado. Delgado* held that no seizure occurs so long as INS agent conduct does not give workers reason to believe that they would be detained if they gave truthful answers to the questions put to them or if they simply refused to answer. 466 U.S. at 218, 104 S.Ct. at 1763. In particular, in *Delgado,* one example of hands-on touching, a tap on the shoulder to attract attention, was held not to constitute a seizure. *Id.* at 220, 104 S.Ct. at 1764.

■ We find no significant difference between the *Delgado* shoulder tap and the Nunez encounter. The evidence shows that one of the officers grabbed Nunez to get his attention, and released him as soon as Nunez turned to face him. *Compare Sokolow,* 808 F.2d at 1369 (a seizure occurred when officers grabbed, moved, and forcibly seated an individual). Nunez testified that he was not afraid of the agents. At their request he showed them his papers, and then left. It does not appear that Nunez was pressured into answering questions or restrained. He was thus not seized within the meaning of the fourth amendment.

### B. *Martinez*

■ Martinez had several encounters with INS agents. We hold that two encounters resulted in a detention. First,

after Martinez was checked by Nygaard, another agent prevented her from leaving the belt area. She was detained. The agent's conduct exceeded any detention approved in *Delgado.* No reasonable person in Martinez's position would have felt free to leave. Second, when Martinez tried to leave the building to retrieve Marines' papers, an INS employee physically restrained her until another INS agent indicated that she could go. Again, no reasonable person in Martinez' position would have felt free to leave. To say that this encounter did not rise to the level of a fourth amendment seizure is to clothe INS agents with authority not found in *Delgado.*

A more difficult question is whether, assuming a fourth amendment seizure, the seizure was reasonable in light of the Supreme Court's implicit approval of factory sweeps. *See Delgado,* 466 U.S. at 221–24, 104 S.Ct. at 1765–67 (Powell, J., concurring). On one hand, INS agents must be permitted to take reasonable measures to ensure that workplace surveys proceed smoothly and that illegal aliens do not slip away. On the other hand, *Delgado* does not authorize detention without individualized and articulated grounds for each incident. *See id.* at 216–17, 104 S.Ct. at 1763 (where a worker merely refuses to answer but does not attempt to flee or evade the agents, any additional steps taken by the agents must be supported by "some minimal level of objective justification to validate the detention or seizure"); *see also Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968). Our own cases hold that to detain a worker short of an arrest, an INS officer must have an objectively reasonable suspicion that the particular worker is an illegal alien. *ILGWU v. Sureck,* 681 F.2d 624, 638 (9th Cir. 1982), *rev'd on other grounds sub nom. INS v. Delgado,* 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984); *United States v. Rocha-Lopez,* 527 F.2d 476, 478 (9th Cir. 1975), *cert. denied,* 425 U.S. 977, 96 S.Ct. 2181, 48 L.Ed.2d 802 (1976). The agent who stopped Martinez from leaving the belt area had no basis for suspecting that she was an illegal alien. Nor did Ferguson, who stopped her at the door. Therefore, the detentions were unreasonable and the court erred in denying her claim as a matter of law.

### C. *Marines*

Agent Colson detained Olga Marines for about 20 minutes while Martinez retrieved her papers. Marines does not contend that agents lacked a reasonable basis for detaining her, but argues that the detention was far more intrusive, frightening and embarrassing than the circumstances required.

The scope of a *Terry* stop must be reasonably tailored to its purpose. *Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 3149, 82 L.Ed.2d 317 (1984); *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983) (plurality opinion). The stop may last only so long as is necessary to carry out its purpose and the investigative methods used should be the least intrusive means reasonably available to confirm or dispel the officer's suspicion. *Royer,* 461 U.S. at 499–500, 103 S.Ct. at 1325–26. The government has the burden of showing that the seizure was so limited. *Id.* However, a reviewing court should keep in mind the pace of events occurring at the time of the stop and should not substitute its judgment about the best means of investigation for that of the officers. *United States v. Sharpe,* 470 U.S. 675, 686–87, 105 S.Ct. 1568, 1575–76, 84 L.Ed.2d 605 (1985). A *Terry* stop becomes an arrest, and must be supported by probable cause, when a reasonable person would believe that he or she was under arrest. *United States v. Patterson,* 648 F.2d 625, 632 (9th Cir.1981).

We hold that under all the circumstances, detaining Marines for 20 minutes was reasonable. Admittedly, there were other options, for instance, an agent could have accompanied her to her car, or alerted the agent in the parking lot to watch for her. However, as the factory was a scene of anxiety and confusion, the agents were busy. They had to decide whether anyone could be spared to accompany Marines to her car. In hindsight, it might have been

better to let her go to the parking lot by herself. On balance, considering the confusion and the pace of events, we cannot say that the agents acted unreasonably in choosing to keep Marines in the plant. *See Sharpe,* 470 U.S. at 686–87, 105 S.Ct. at 1575–76.

Once the agents decided to detain Marines, they acted reasonably. Although Agent Colson threatened to tie her hands if she tried to leave, he did not thereby transform her detention into an arrest. While his language and tone were intemperate, under the circumstances they would not have led a reasonable person in Marines' position to believe that she was under arrest.

The agents placed those they arrested in a van bound for Boise. Marines was treated differently. The agents detained her inside, and let her know that she would be released as soon as Martinez returned with her papers. Had she been in compliance with the "green card" statute,[4] she would have avoided the inconvenience.

### D. *Rayo*

 When Rayo told Colson her papers were at home, he placed her with other detained workers in the plant. After about fifteen minutes, she was taken to the van bound for Boise. Five minutes later she was released, when her husband arrived with her papers. We hold that Rayo was arrested, but that her arrest was reasonable. First, the agents had probable cause to believe Rayo had violated the "green card" statute, as she did not have her papers on her person. An individual's admission that she is an alien, coupled with her failure to produce her green card, provides probable cause for an arrest. *See Benitez-Mendez v. INS,* 760 F.2d 907, 909 n. 2 (9th Cir.1985).[5] The agents held her only until her husband brought her card. Reasonable detention was not made unreasonable by

the failure of defendants at trial to remember the specific reasons for her detention. *See INS v. Lopez-Mendoza,* 468 U.S. 1032, 1049, 104 S.Ct. 3479, 3488, 82 L.Ed.2d 778 (1984) (as INS agents arrest over one million deportable aliens a year and the arrests often occur in crowded and confused circumstances, they cannot be expected to recall the precise basis for every detention).

In sum, we affirm the judgment of the trial court denying equitable relief. We affirm the judgment denying damages to Nunez, Marines and Rayo. We reverse the judgment in favor of defendants on Martinez' claims and remand her claims for further proceedings.

Affirmed in part, reversed in part and remanded. Martinez to recover costs on appeal.

---

**4.** Title 8 U.S.C. § 1304(e) requires all aliens over 18 years old to carry their registration papers at all times. Violation of the statute is a misdemeanor.

**5.** In *Benitez-Mendez v. INS,* 760 F.2d 907, 909 n. 2 (9th Cir.1985), this court stated by way of

dicta that an alien, who was arrested while working in a field, was in constructive possession of his green card because he kept the card in a parked car next to the field. Constructive possession does not apply here because Rayo kept her card at home, far from her worksite.