### UNITED STATES of America, Plaintiff-Appellee,

### v.

### SEVENTY–THREE THOUSAND, TWO HUNDRED SEVENTY–SEVEN DOLLARS, UNITED STATES CURRENCY, Defendant,

### Appeal of Joseph STECKEL, Claimant-Intervenor.

### No. 82–2536.

United States Court of Appeals, Seventh Circuit.

Argued April 26, 1983.

Decided May 31, 1983.

---

James J. Ewers, Eisenberg, Giesen, Ewers & Hayes, S.C., Madison, Wis., for claimant, intervenor.

Canella E. Henrichs, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before PELL, POSNER and COFFEY, Circuit Judges.

COFFEY, Circuit Judge.

This appeal concerns the legitimacy of a search and seizure conducted by agents of the Drug Enforcement Administration (DEA) at Chicago's O'Hare International Airport. This is an action brought by the government for forfeiture of $73,277.00 in currency found in the possession of one Joseph Steckel. The district court, after finding no violation of the claimant's Fourth Amendment rights, concluded that the intended use of the seized money was to purchase a controlled substance. The court ordered the currency forfeited to the United States pursuant to 21 U.S.C. Section 881(a)(6). The claimant, Joseph Steckel, appeals. The order of the district court is AFFIRMED.

### I.

On May 15, 1980, Drug Enforcement Administration agents Bob Fulkerson and George Faz were stationed at O'Hare International Airport monitoring the arrival of airline passengers on flights originating from the Miami-Fort Lauderdale area. The DEA had previously determined that southern Florida is a major source area for illegal drugs and narcotics and thus, as part of their assault on illicit drug trafficking, agents frequently observe passengers arriving on flights originating from this area.

At approximately 11:15 a.m., Delta Airlines Flight No. 548 arrived from Fort Lauderdale. Among the passengers deplaning was one Joseph Steckel carrying a brown vinyl travel bag. Steckel attracted the attention of the agents as he cautiously surveyed the people in the boarding area after deplaning. After departing from the gate area, Steckel entered the concourse area and looked to his rear, over his shoulder on several occasions as he proceeded to a telephone booth where he placed a call and continued to scan the concourse area, up and down, while in the booth.

After completing the call, Steckel proceeded through the Delta Concourse toward the main terminal. At this point Agents Fulkerson and Faz began to follow him. Steckel continued to glance over his shoulder, scanning the concourse area in a manner consistent with an attempt to detect surveillance. He proceeded to and entered a restroom and after a short time exited the restroom and walked toward a row of wall-mounted telephones.[1] Steckel then appeared to place several additional telephone calls, all the while looking up and down the concourse area. After completing these calls, Steckel headed toward the main terminal repeatedly glancing over his shoulder and making eye contact with Agent Fulkerson. About halfway through the concourse, Steckel stopped near a small seating area and Agent Fulkerson approached him.

Agent Fulkerson testified that he walked alongside Steckel, identified himself as a federal officer, showed him (Steckel) his badge and asked him if he could speak with him for a minute. Steckel replied that it

---

1. Agent Faz discontinued his surveillance of Steckel sometime after the claimant exited the restroom. The surveillance observations thereafter were made by Agent Fulkerson alone.

would be "okay."[2] When Fulkerson asked Steckel for some form of identification, Steckel replied that he had left his billfold in Madison, Wisconsin and was thus without any formal identification, but he did orally identify himself to the officer as Alan Bundy and indicated that he had been in Florida visiting friends. Fulkerson requested Steckel to display his airline ticket, and upon examination he noted that the ticket had been issued in the name of an alias, Alan Bundy, and had been paid for in cash. Fulkerson returned the ticket to Steckel, and in doing so observed that Steckel was upset as he was physically shaking and his voice was quivering.

In response to further questioning, Steckel told Fulkerson that he had been in Florida for the past four days visiting friends, that he was presently unemployed and that his travel bag contained clothes. During the initial stages of this conversation Fulkerson informed Steckel that he was not under arrest. Agent Fulkerson then asked Steckel if he would consent to a search of his travel bag, informing him that the search was voluntary and he could refuse. Steckel refused the search request at this time and stated that he was in a hurry to catch his plane. Fulkerson next inquired as to the time Steckel's flight was scheduled to depart and Steckel advised him that it was to leave at 12:30 p.m. Fulkerson then informed Steckel that since it was only 11:40 a.m., he had plenty of time to catch his flight which would be departing from the Republic Airlines gate a short distance away.

Fulkerson resumed his questioning asking Steckel if his travel bag contained any drugs and Steckel replied "no." Fulkerson inquired about what Steckel's travel bag contained in addition to clothing and after some hesitation Steckel stated that there was approximately $50,000.00 in cash in the bag which he had taken to Florida for investment purposes. Agent Faz had rejoined Fulkerson during this conversation with Steckel. Fulkerson again requested permission to inspect the travel bag and this time, according to Agent Fulkerson, Steckel agreed, sat down in the public seating area and unzipped the bag and opened it, revealing a large sum of money.

Shortly after the discovery of the large amount of currency in the travel bag, three other DEA agents joined Fulkerson and Faz. George Salvemini, Fulkerson's supervisor, was promptly apprised of the situation including Fulkerson's suspicions and observations. Salvemini sat on the seat next to Steckel and in response to questions put to him by Agent Salvemini, Steckel revealed his true identity and stated that he had been in Florida working on an investment for his father initially stating that he had intended to purchase real estate, later changing his story, saying he had intended to purchase a boat. A subsequent search of Steckel's travel bag by Agent Salvemini revealed a small amount of suspected marijuana residue in the bottom of the bag.[3] Steckel's other piece of luggage, a suit bag, was then retrieved by agents who discovered a small plastic bag containing marijuana therein and airline tickets issued in the name of two aliases.[4] Steckel explained to the agents that the contents of the bag was kitty litter, rather than marijuana. Steckel was then arrested and given his *Miranda* warnings. Steckel initially stated that he

---

2. Steckel disputes Fulkerson's version as to how the questioning was initiated. Steckel testified at trial that he was leaving a row of telephones and was walking parallel to the concourse wall when Agent Fulkerson approached and put his hand up against the wall and thereby impeded his progress. The district court chose not to believe this testimony and instead chose to believe the testimony of Agent Fulkerson.

3. The propriety of this consensual search by Agent Salvemini has not been challenged.

4. During his initial conversation with Steckel, Fulkerson had noticed a Delta baggage claim check attached to Steckel's ticket. According to DEA records introduced into evidence, Steckel explained to Fulkerson that he had an additional piece of luggage. During his conversation with Fulkerson, Steckel allegedly gave the DEA agents permission to retrieve the luggage and search it. The district court made no factual findings on the propriety of this search, nor is it being challenged on appeal.

had traveled to Florida to purchase cocaine for a friend and that the currency belonged to that friend. Later that day, in return for an assurance that no criminal action would be taken against him, Steckel signed a written statement in which he stated that he had been "dealing" in marijuana for the past 2½ years and had consummated transactions with a DEA-known drug trafficker. He also admitted that he had gone to Florida on this occasion intending to purchase 250 pounds of marijuana at $300.00 per pound, but had been unable to do so.

The government then brought the present action under 21 U.S.C. § 881(a)(6) for forfeiture of the money seized from Steckel, $73,277.00, on the ground that the currency was the proceeds of a drug transaction or was intended to be used to purchase a controlled substance.[5] As claimant, Steckel asserted that the DEA agents lacked probable cause or a reasonable basis for an investigatory stop of him and the subsequent seizure and forfeiture of the currency violated his constitutional rights.[6] The forfeiture case proceeded to trial before the district court and on August 16, 1982, the district court found that: (1) the initial encounter between Steckel and Fulk-

erson was not a seizure; (2) Steckel had given valid consent prior to the search of his travel bag; (3) the earliest point a seizure occurred was at that moment in time when Fulkerson and Faz were joined by the other three DEA agents; (4) the seized currency was intended to be used to purchase a controlled substance; and (5) the seized currency was ordered forfeited to the United States. This appeal followed.

## II.

Steckel's principal argument on appeal is that the seizure of his person at the airport was unlawful. He argues that the seizure of his person occurred either at the moment Fulkerson initially approached him or when he told Fulkerson that he had a plane to catch. Steckel maintains that the seizure was without a reasonable suspicion that criminal activity was afoot. The fruit of this illegal seizure, the currency, should thus be suppressed as "fruit of a poisonous tree" per *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). Steckel disagrees with the trial court's conclusion that he voluntarily consented to the search of his travel bag and contends the determination was erroneous.[7]

---

5. 21 U.S.C. § 881 provides, in pertinent part:
   "(a) The following shall be subject to forfeiture to the United States and no property right shall exist in them:

   \* \* \* \* \* \*

   "(6) *All moneys,* negotiable instruments, securities or other things of value furnished or *intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter,* all proceeds traceable to such an exchange, and *all moneys,* negotiable instruments, and securities used or *intended to be used to facilitate any violation of this subchapter,* except that no property shall be forfeited under this paragraph, to the extent of the interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner." (emphasis added).

6. The exclusionary rule has been held applicable to forfeiture proceedings. *See One 1958 Plymouth Sedan v. Pennsylvania,* 380 U.S. 693, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965).

7. We expressly note that Steckel has failed to challenge the forfeitability findings made by

the district court. It is apparent from Steckel's statements in the record that there is little doubt that the intended use of the currency found in Steckel's travel bag was for the purchase of a controlled substance and was therefore properly subject to forfeiture. The legislative history surrounding 21 U.S.C. § 881 makes clear that the primary goal of the statute is to cripple illegal drug trafficking and narcotics activity. Specifically, the applicable House Report notes that:

"Enforcement officers of the Government have found that one of the best ways to strike at commercialized crime is through the pocketbooks of the criminals who engage in it."

H.Rep. 2781, 1950 U.S. Code Congressional Service 2952, 2953. The present forfeiture proceeding certainly fits within the ambit of the statute's intent. Traffic in illicit drugs is a matter of pressing national concern, and the fact that Steckel was unsuccessful in his attempt to ply his unlawful trade in no way lessens society's interests. Given the strength of the national interest in this area, the present forfeiture proceeding is an especially appropriate vehicle to discourage unlawful enterprises by individuals such as the claimant.

When evaluating the findings of the district court concerning an airport drug courier alleged search and seizure such as the one involved herein, our review is narrow. The determination whether an encounter between an individual and a law enforcement officer constitutes a "seizure" is an extremely factual one, depending on the circumstances of each particular case. *United States v. Moya,* 704 F.2d 337 at 341 (7th Cir.1983). Particular deference must be given to the district judge who had the opportunity to observe the demeanor and hear the testimony of the witnesses. *United States v. Black,* 675 F.2d 129, 134 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

As an appellate court, we are not at liberty to substitute our judgment for that of the trial court. *See United States v. Briggs,* 700 F.2d 408, 416 (7th Cir.1983). An appellate court's function is limited. It is the fact finder's function to hear and observe the witnesses and to weigh the conflicting evidence. On appeal, we are not to decide a case based on what we, as individual judges, would have decided under the same or similar circumstances. Rather, we must accept the factual findings of the trial court unless those findings are clearly erroneous. *See Washington v. Sherwin Real Estate, Inc.,* 694 F.2d 1081, 1090 (7th Cir. 1982).

### III.

The primary issue raised on appeal concerns whether Steckel was unlawfully seized prior to the search of his travel bag. As our recent *Black* and *Moya* decisions make clear, analysis of this issue concerns two questions: (1) was the suspect seized; and (2) if the suspect was seized, was there objective justification at the time of seizure sufficient to create a reasonable suspicion that the suspect was engaging in criminal activity. *Black,* 675 F.2d at 132; *Moya,* at 340.

In *Black,* we adopted Justice Stewart's "reasonable person" test for determining whether a seizure has occurred. 675 F.2d at 133. *See also Moya,* at 341.

Six of the present justices of the United States Supreme Court have also placed their imprimatur upon this test. *See Florida v. Royer,* —— U.S. ——, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion of White, J.) (with Marshall, J., Powell, J., and Stevens, J., concurring) and (Blackman, J., dissenting); and *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Stewart, J.) (with Rehnquist, J., concurring). The "reasonable person" test recites that a person has been seized within the purview of the Fourth Amendment if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. In making this determination, a variety of factors present at the time of the encounter are important, primarily: the conduct of the law enforcement officers; the person of the individual citizen including his or her educational and psychological background, age, etc.; and the physical surroundings involved.

### A.

Steckel initially argues that a "seizure" occurred at the moment Agent Fulkerson first approached him. At trial, Steckel testified that Fulkerson stopped him in the airport by putting his (Fulkerson's) hand against a wall, thereby blocking Steckel from proceeding on his way. Steckel argues that at this point he was effectively seized.

After hearing all the testimony, however, the district court concluded otherwise. The court found that as Fulkerson walked alongside Steckel, he identified himself as a federal officer and asked Steckel if he could speak with him for a moment. According to the court's findings, Steckel responded with an affirmative "okay." This type of police-citizen encounter clearly involved no seizure. As the Supreme Court has recently observed:

"[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or

in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions."

*Florida v. Royer,* —— U.S. at ——, 103 S.Ct. at 1324 (citations omitted).

■ Steckel proceeds to argue that even if Agent Fulkerson's testimony is accepted as true, such a police-citizen encounter is inherently offensive. We disagree. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but to prevent arbitrary and oppressive interference on the part of law enforcement officials with the personal security and privacy of individual citizens. *See Mendenhall,* 446 U.S. at 553–54, 100 S.Ct. at 1876–1877. We agree with the findings of the trial court and fail to see how Agent Fulkerson's actions constituted an oppressive interference with Steckel's personal security and privacy. Fulkerson did not approach Steckel with a coercive showing of force (only two DEA plainclothes officers) or authority (no handcuffs or gun displayed) but addressed him in a normal conversational tone.

As the Supreme Court has noted, police questioning is an essential tool in the effective enforcement of the criminal laws. *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877. In light of the compelling national interest society has in effectively "wiping out" illegal drug use and detecting those who traffic in deadly drugs for personal profit, voluntary police-citizen encounters are necessary, particularly at major metropolitan airports, in order that law enforcement officers might attempt to protect the security of our nation. The decision of the district court will not be disturbed unless it is clearly erroneous. Upon a review of the record we agree with the trial court that Fulkerson's approach and initial conversation with Steckel was nothing more than a lawful police-citizen contact, noncoercive and consensual.

### B.

Steckel's next argument is that a seizure occurred at the moment immediately after Steckel, in declining Fulkerson's request to search his travel bag, told the agent that he was in a hurry to catch his plane. As noted above, Agent Fulkerson informed Steckel that he was not under arrest, he could refuse to have his travel bag searched and Steckel had ample time to catch his flight, and Fulkerson proceeded to ask what else was in Steckel's travel bag. It was at this point, Steckel argues, that a reasonable person would have believed that he was not free to go.

In support of his contention, Steckel cites the following factors: (1) his alleged "request to leave" was made a full ten minutes after Fulkerson had initiated the conversation; (2) Steckel had only a ninth grade education and had a complete lack of previous exposure to the criminal justice system; and (3) Fulkerson had never told Steckel that he was free to refuse to answer any questions.

■ As previously noted, the question of whether Steckel was "seized" at this point was a factual determination made by the trial court. From our review of the record, we hold that the evidence clearly supports the district court's finding and conclusion that Steckel had not yet been seized at this point in time: (1) earlier in the conversation Fulkerson had informed Steckel that he was not under arrest; (2) in asking Steckel if he could search the travel bag, Fulkerson explained to Steckel that the search was voluntary and he could refuse; (3) Steckel, and not Fulkerson, had custody of his travel bag and airline ticket at this time; (4) all of the events transpired in an open, public area of the concourse with many other travelers present; (5) Agent Fulkerson displayed no weapon or handcuffs, never physically touched Steckel and never told him that he was not free to leave; and (6) Steckel did not attempt to walk away or discontinue answering questions at this time. Here, as in *Mendenhall,* 446 U.S. at 544, 100 S.Ct. at 1872, the trial court was entitled to view the statement that the

suspect "had a plane to catch" as simply an expression of concern on the part of the claimant that he was in a hurry and that the questioning be conducted quickly. *See Mendenhall*, 446 U.S. at 559, 100 S.Ct. at 1879. The fact that Steckel had only attended school through the ninth grade, although relevant, is not decisive and there is no specific evidence showing that Steckel was "so naive or vulnerable to coercion that special protection from police contacts was required by the Fourth Amendment." *See Moya*, at 341. The totality of the circumstances indicates that the district court's conclusion is clearly not erroneous.

### C.

The district court concluded that Steckel was effectively "seized" at the moment the three other DEA agents joined Agents Fulkerson and Faz in the airport concourse. In light of this conclusion, we proceed to the next stage of our analysis—whether there was sufficient objective justification to create at that moment a reasonable suspicion that the suspect was engaging in criminal activity.

■ In determining whether there exists a reasonable suspicion of criminal activity, a court must consider the totality of the circumstances. *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). Agent Fulkerson was entitled to assess the totality of Steckel's conduct in light of his own experience. Among the circumstances that can give rise to reasonable suspicion are the officer's experience and knowledge of the methods used in drug courier activity, characteristics of persons engaged in such illegal practices, the behavior of a suspect who appears to be evading police contact and the suspect's efforts to conceal the truth during a police-citizen encounter. *See Moya*, at 343. Common sense and substance must prevail for, as the Supreme Court noted:

"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articu-

lated as such, practical people formulated certain common sense conclusions about human behavior; jurors as fact finders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."

*United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). *See also Brown v. Texas*, 443 U.S. 47, 52 n. 2, 99 S.Ct. 2637, 2641 n. 2, 61 L.Ed.2d 357 (1979); *Florida v. Royer*, —— U.S. ——, —— —— —— n. 6, 103 S.Ct. 1319, 1322–1323 n. 6, 75 L.Ed.2d 229 (1983) (Rehnquist, J., dissenting).

■ In the instant case, Agent Fulkerson was aware of the following information at the time Steckel is considered by the district court to have been seized: (1) Steckel arrived on a flight from Fort Lauderdale, a city known to be a principal place of origin for illicit drugs; (2) Steckel scrupulously surveyed the gate area after deplaning; (3) Steckel repeatedly glanced to his rear while moving through the terminal; (4) Steckel twice removed himself from the flow of pedestrian traffic (ostensibly to make several phone calls) and surveyed the concourse in all directions in a manner consistent with one trying to detect surveillance; (5) Steckel carried no identification with him and he paid for his plane ticket in cash (common attributes of many drug traffickers according to Agent Fulkerson); (6) Steckel was visibly nervous and shaking and his voice quivered during the encounter with Agent Fulkerson; (7) Although Steckel told Fulkerson that he was unemployed (again, a common attribute of many drug traffickers according to Agent Fulkerson), by Steckel's own estimate he was carrying in excess of $50,000 in currency; and (8) Steckel changed his story, originally stating that he was in Florida visiting friends and later changing his story to say that he was in Florida pursuing an investment deal for his father.[8] We hold these factors, in the

---

**8.** The implausibility of Steckel's second story

was heightened by Agent Fulkerson's common

aggregate, were more than sufficient to justify a temporary investigatory stop of Steckel while the agents attempted to verify or dispel their well-founded suspicions.

### IV.

The final issue we address is Steckel's claim that he never gave consent to Fulkerson to open the travel bag and search it. Steckel's version of the search is that Fulkerson reached over and opened the travel bag on his own, without receiving Steckel's consent. The district court, however, after hearing and weighing all the testimony and observing the demeanor of the witnesses made a contrary factual finding and concluded, in fact, that Steckel had consented to the search of his travel bag. The district court found that Steckel personally and voluntarily unzipped the travel bag and opened it for Fulkerson. We are not persuaded, based on the totality of the circumstances, that the district court's finding, made after viewing all the testimony and having weighed the credibility of the witnesses, is clearly erroneous. In making its conclusion the district court properly applied the standards set forth in *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973).

■ Choosing to believe Agent Fulkerson rather than Steckel on the consent issue was a judgment that the trial court was in a far better position to make as it had the opportunity to view, hear and weigh the testimony of the witnesses. *Black,* 675 F.2d at 134. Furthermore, it should be pointed out that Steckel was well aware of his right to withhold consent as evidenced by his initial refusal to consent to the search. We hold, based upon a complete review of the record, that the trial court was warranted in finding that the nature of Agent Fulkerson's interrogation was unintrusive and noncoercive and Steckel evinced a willingness to cooperate in responding to Fulkerson's questions. Nor will we say that the

search was tainted by an earlier unlawful seizure, as we have already concluded that Steckel's person could not reasonably be considered as "seized" at the time Fulkerson, during a lawful police-citizen encounter, looked into the travel bag with Steckel's consent.

■ In essence, Steckel's argument simply is that his testimony is more worthy of credit than Agent Fulkerson's. As stated, this was an assertion that the finder of fact resolved and it is not for the appellate court to overturn a factual finding unless it is unsupported in the record and clearly erroneous. It was entirely proper for the trial court to disbelieve the testimony of Steckel who: (1) initially gave Agent Fulkerson two different stories about why he had traveled to Florida (first saying that he had gone to Florida to buy real estate and later stating that he had intended to purchase a boat); (2) initially lied to Fulkerson about his identity and was known to use at least two aliases; (3) gave at least four different explanations of the intended use of the currency (to purchase real estate, a boat, cocaine or marijuana); (4) told three different stories about the ownership of the currency; and (5) claimed to have made up "out of the clear blue sky," the name of an individual known to the DEA as an active drug trafficker. It is eminently clear why the trial court decided to credit the trial testimony of Agent Fulkerson over that of Steckel. The finding that Steckel voluntarily opened his travel bag for Agent Fulkerson is not clearly erroneous and will not be disturbed.

### V.

The forfeiture order of the district court is hereby AFFIRMED.

---

sense observation that few, if any, legitimate investment transactions involve a travel bag containing thousands of dollars in cash which is carried by a young, college-aged, and admit-

tedly unemployed individual. This factor further contributed to Agent Fulkerson's suspicions.