**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William W. BODEN, Defendant–Appellant.**

No. 86–2701.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 26, 1987.

Decided Aug. 10, 1988.

984

George P. Lynch, George P. Lynch, Ltd., Chicago, Ill., for defendant-appellant.

Patrick J. Foley, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUDAHY, RIPPLE and MANION, Circuit Judges.

MANION, Circuit Judge.

Defendant William Boden was tried on stipulated facts without a jury and convicted of violating 18 U.S.C. § 842(a)(1), which makes it unlawful for any person "to engage in the business of ... dealing in explosive materials without a license." He appeals from the district court's order denying in part his earlier motion to suppress evidence the government seized and oral statements he made during an encounter with agents of the Bureau of Alcohol, Tobacco and Firearms (the Bureau). We affirm.

## I. NATURE OF THE CASE

### A. *Prelude*

The testimony at the suppression hearing and stipulations of fact subsequently filed by the parties tell the following.[1] Defendant Boden, a resident of Aurora, Illinois, was a federally-licensed gun dealer doing business as The Gun Lodge in Aurora. Boden did not have an explosives license or permit. See Title XI of the Organized Crime Control Act of 1970, 18 U.S.C. § 843. On August 1, 1975, Boden pleaded guilty in state court to illegally selling and possessing explosives.

In April, 1985, the Bureau, responding to a tip from one Robert Manella, began to investigate whether Boden was again selling explosives. Manella had known Boden for several years and had purchased guns from him. On June 18, 1985, at approximately 10:00 a.m., Manella, while wearing an electronic transmitter, spoke to Boden at The Gun Lodge. An agent of the Bureau, Douglas Moore, listened in. During that conversation, Boden agreed to sell to Manella two cases of M–80 explosives for $250 per case. M–80s are frequently used as firecrackers on the Fourth of July. Boden and Manella were to meet at a prearranged location at 8:00 that evening.

---

1. "It is settled law that the validity of an arrest or search can be supported by evidence which was adduced at trial even though this was not presented at the pretrial suppression hearing." *United States v. Canieso,* 470 F.2d 1224, 1226 (2d Cir.1972).

After Boden's conversation with Manella that morning, the government began both ground and aerial surveillance of The Gun Lodge. As Agent Gene Oitker testified at the suppression hearing, the purpose of the surveillance was "[t]o ascertain if Mr. Boden was going to make sales or deliveries of explosives." At 6:05 p.m., the agents watching Boden observed him drive in a 1978 red Mercury station wagon to The Cedar Chest, a commercial self-storage facility in Winfield, Illinois.

Boden had rented a storage unit at The Cedar Chest, a facility which features seven buildings containing rows of walk-in storage units. The Cedar Chest rents to the public. The complex is surrounded by a six-foot fence, with barbed wire across the top. There is one entrance, through an electric sliding gate, and tenants and those they invite admit themselves by using a computerized key card; they then sign in at an office by the gate. On June 18, however, the entry system was broken, so the gate remained open. A sign prominently posted warned that if the management spotted any unauthorized person on the premises, they would call the police.

Boden entered and signed the facility's daily access report. Glen DeVries, who owns The Cedar Chest, was in the office at the time.

At approximately 6:30 p.m. on June 18, an agent in an airplane observed Boden several times carry unmarked boxes from his unit to the rear of his station wagon parked nearby. The agent in the airplane relayed what he had observed to the agents on the ground. What happened next was subject to conflicting testimony.

### B. *The Government's Version*

According to the government's version, at approximately 6:30 p.m., Agent Oitker heard on his radio that Boden had traveled to The Cedar Chest, had parked his car next to a storage unit, and was going to and from his car and the unit. Oitker knew Boden from previous encounters at The Gun Lodge and knew that Boden was a gun dealer. Oitker also knew that Boden had previously dealt in illegal explosives.

In addition, Oitker knew that Boden had agreed to sell explosive devices to Manella that evening. Oitker was concerned that such devices might detonate by accident. As Oitker wrote in his report of the incident immediately afterwards:

> Being concerned that no other personnel could obtain a sufficient vantage point to see exactly what Boden was doing, and being concerned for the safety and welfare of citizens in the nearby area in the event of an accidental detonation, I decided that I should approach Boden at this time.

Oitker drove through the open gate and into the complex. He drove his car past Boden's to see what he was doing. He saw two rows of uniform cardboard boxes in the storage unit adjacent to Boden's car. Upon seeing Oitker, Boden rolled down the door to the storage unit. Agent Oitker got out of his car approximately 15 to 17 feet from Boden and his storage unit. Oitker then flashed his badge, in his own words, "to Mr. Boden's face," and approached him. Oitker testified at the suppression hearing that while he was armed with a .357 Magnum caliber revolver, he did not draw his weapon. As he walked towards Boden, Oitker looked in Boden's station wagon and saw more boxes similar to those he had seen in the storage unit. When Oitker reached Boden, he said "Hello, Bill," and gave his full name and that of the government agency he represented. Agent Oitker then asked Boden what the cardboard boxes in the rear of his car contained, and Boden responded, "Fireworks."

After Boden said he had fireworks in his car, Agent Oitker asked Boden whether he was armed. When Boden responded that he had a handgun in his right rear trouser pocket, Agent Oitker asked him to place his arms on top of his station wagon, which Boden did. Agent Oitker frisked Boden and removed a loaded .38 semi-automatic pistol from Boden's right rear trouser pocket. Agent Oitker then escorted Boden away from his station wagon to his own car and placed Boden's pistol in his car's trunk.

Agent Oitker then asked Boden whether he had any more weapons with him. Boden replied that he did not know but that there might be a weapon in his car because he sometimes carried one there. According to Oitker, Boden stated that he did not want the agents to think that he was armed with more than the one gun, and, as Oitker testified, "that I should go ahead and look for the other firearm to prove it was there or not there." Thus invited, Oitker entered Boden's car.

While searching Boden's car for another weapon, which he did not find, Agent Oitker found on the floor beneath the front seat a form receipt book with numerous entries describing sales of M-80s. Agent Oitker took the sales book.

Agent Oitker then walked to the back of Boden's car and again looked through the rear window. He counted 11 sealed boxes and a grocery bag. He opened the rear door and looked inside the grocery bag. He saw that the bag contained a number of smaller bags. Based upon his experience in investigating illegal sales of explosives, he believed that the smaller bags were packages of explosives. He opened one of the smaller bags and saw that it contained M-80 explosives. He asked Boden whether each box contained this type of device, and Boden confirmed that they did. Oitker decided to seize the boxes and grocery bag but informed Boden that as soon as the explosives were removed from his car, Boden could take the car and leave. But Boden responded that he wanted to stay and observe what the agents would do.

Oitker then asked Boden what was located in his storage locker. Boden responded with the answer "more fireworks." When Agent Oitker asked how many fireworks there were, Boden replied, "I don't know for sure, but we can count them."

It was now 6:58 p.m. After telling Boden he was not under arrest, Oitker pulled out a standard waiver of rights form, which listed among other rights the right to remain silent and the right to counsel. After Oitker read Boden his rights, Boden stated that he understood his rights and signed the form.

Boden then refused to waive any of his rights. In particular, Oitker asked Boden to make a written statement as to what had transpired up to then. Boden refused to do so, stating that he wanted to talk to a lawyer before giving a written statement.

Oitker then asked Boden for permission to search the storage unit, telling Boden that if there were explosives in there, then they would have to be removed. Oitker further informed Boden that he could require the agents to obtain a search warrant, or instead could give the agents permission. If Boden did not consent, then the agents could and would obtain a search warrant. Given those choices, Boden replied: "Let's open it up."

The agents went into Boden's storage unit and searched it. By the time the agents had finished more than two hours later, they had seized a substantial additional amount of explosives. During the search of his unit, Boden made several additional incriminating statements.

The entire search lasted two and one-half hours. An explosives expert would have testified that the M-80 explosives seized from Boden were extremely sensitive to spark or flame initiation and would explode violently once initiated.

According to the agents, they never restrained Boden. He was not handcuffed. Contemporaneous photographs taken by one of the agents submitted into evidence at the suppression hearing showed Boden walking around unimpeded. Oitker further testified that neither he nor any other agent threatened Boden. Oitker testified that while he was not sure, he thinks Boden stood nearby while he searched Boden's car. Oitker believes that a fellow agent may have been at Boden's side during that search, even though he had not directed any agent to keep Boden "in custody" during the search.

Oitker insisted at the suppression hearing that Boden was always free to leave. Oitker testified that he advised Boden at least three times that he was not under arrest and was free to go. In particular,

I informed him immediately after I approached him, and secured the firearm from him ..., that he would not be arrested, that he could go at that time, if he chose to, with or without his car. In other words, he was free to walk away, instead of drive away. Later I told him that when we got the car emptied out, he could take the car....

Boden ultimately left at about 8:30 that evening, at least one-half hour before the officers completed their search.

Oitker further testified that he never withdrew his gun from his holster during the entire two-and-one-half hour period. He further testified that the agents who arrived after him—Adair, Mueller, plus another agent—did not draw their weapons either. Agent Adair similarly testified that he never took his weapon out of his holster, all the more that he pointed it at Boden. Agent Mueller testified that by the time he drove to the area where Boden's automobile was parked, he saw Boden along with Agents Oitker and Adair. Agent Mueller testified that when he first exited his car, he may have had his gun at his side: "I either had my hand on the butt of the firearm, or I unholstered it and would have had it at my side, probably." Upon seeing that the situation was secure, Mueller returned his weapon—assuming it was drawn—to its holster. Agent Mueller flatly stated that at no time during his presence at The Cedar Chest did a government agent point a revolver at Boden.

There was some discrepancy in the testimony of the other agents regarding where they were and when. Agent Mueller testified that he arrived at The Cedar Chest by 6:35 p.m. "Well, I was making haste. I wasn't sure what was happening; ...." Agent Mueller approached in time to hear Boden say "fireworks" in response to Agent Oitker's question about the boxes in the station wagon. Agent Mueller then went back to his car to communicate to other agents by radio that the scene was secure. When Agent Mueller returned to where Boden was standing with Agents Oitker and Adair, he saw Agent Oitker holding Boden's pistol.

Agent Adair testified that he came onto the premises no later than 20 seconds after Oitker. Adair would switch the order of the initial question and the frisk. By the time he drove onto the premises and parked near Boden's station wagon, Adair saw Boden with his hands placed on top of his wagon and Agent Oitker behind Boden holding Boden's gun. Agent Adair only then heard Boden state that the boxes in his automobile contained "fireworks."

Agent Oitker, in comparison, testified that he had recovered Boden's gun and obtained the admission about "fireworks" in the car *before* the other agents arrived. The other agents drove in to back him up only after he finished searching the car for another weapon. It was at this point, when Oitker started to ask Boden about what was in his storage unit, that Adair arrived: "Adair came there a few moments after I removed the .38 automatic from Mr. Boden's pocket. He was standing nearby when I asked those other questions." Subsequently, after asking Boden what the locker contained, two more agents arrived. While Oitker testified that they came "within a few moments," he could not pinpoint when exactly they arrived: "I can't say exactly when or at what point that they did appear."

Also arriving shortly afterwards were two DuPage County Deputy Sheriffs in uniform. Oitker had asked a fellow agent to summon the officers to handle any unexpected crowds. According to Oitker, these officers came in five to seven minutes after he arrived.

### C. *Boden's Version*

Boden told a radically different story of his initial encounter with Oitker. According to Boden, he was standing by his storage unit at approximately 6:35 p.m. when he was surrounded by three or four cars. "They all exited, and one agent with a drawn gun showed me his badge, like they normally do, and asked me if I had a weapon." Not only had Oitker confronted him with a drawn gun, he was also accompanied from the start by the other agents, who also had their guns drawn. At the

time of this confrontation, Boden was "[s]cared half to death." But even according to Boden, the agents pointed their weapons at him "[j]ust briefly enough so that I could be relieved of my weapon."

Boden further testified that after Oitker took his gun, he was guarded at all times by agents who told him what to do: "[T]hey directed me to stand here, or stand there, or walk here or walk there." "It was a continuing thing. They kept moving me, jockeying me around different areas, and I most definitely was assigned a guard at all times." Boden testified that he believed he was not free to leave: "I was not free to do anything but stand where they told me to stand and move to where they told me to move."

Boden admitted that he told the agents that there may be another gun under his car seat, but denied asking Oitker to search for that possible additional weapon: "I didn't ask him to search for it. I really didn't want him to find it, ... if, in fact, it was there."

Boden in his testimony confirmed that at least once, without specifying when, the agents told him he was free to leave. But according to Boden, the agents immediately told him afterwards not to move. In addition, Boden stayed because "with four armed men there, you think I was going to run away from them?" Boden in his own mind was permitted to leave only after the agents had removed the boxes from his car: "[B]efore I was allowed to leave, they took the boxes out." This was approximately two hours after his first encounter with Oitker.

The owner and manager of The Cedar Chest, Glenn DeVries, significantly corroborated Boden's version. He testified that while in the office, three or four vehicles drove past the office and onto the premises "at a high rate of speed." According to DeVries, the agents arrived if not together then immediately after each other. After seeing these vehicles come onto the premises, DeVries walked to see what was going on in the direction the cars went. When DeVries had Boden's unit in view, he saw Boden standing in front of his unit, but he did not proceed further "because I observed some men cross with drawn guns." Their guns were pointed at Boden. Boden had been "totally blocked in" by three or four cars. In addition, local sheriff's vehicles had blocked the entrance. DeVries testified, however, that after Boden handed over his weapon, the agents ceased to point their revolvers at him and he was not restrained. Over the next forty minutes, Boden "was very relaxed, didn't seem to be under any particular pressure."

## II. NATURE OF THE PROCEEDINGS

On October 28, 1985, a grand jury returned a one-count indictment charging Boden with violating 18 U.S.C. § 842(a)(1) by dealing in explosive materials without a license. Following his indictment, Boden, represented by retained counsel, moved to suppress all the statements he made to the agents and the evidence the agents seized.

Boden charged that he had been arrested and his person and property searched without his consent, without a warrant and without probable cause. He further alleged that "[a]s a result of the illegal arrest ..., law enforcement officials obtained certain statements," though he did not specify which particular statements he wished to suppress. In addition, he claimed that the agents coerced him into incriminating himself without advising him of his *Miranda* rights. See *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). According to Boden, when he told the agents that he wished to consult an attorney before making any further statements, the agents ignored his request for counsel and continued to interrogate him. Boden then made more incriminating statements to the agents. Thus, Boden argued, the government violated his rights under the Fourth, Fifth and Sixth Amendments in obtaining the statements and evidence from him.

On July 14, 1986, the district court held a hearing on Boden's motions. The court heard testimony from DeVries, the owner of The Cedar Chest, from Boden, and from Agents Oitker, Adair and Mueller.

On that day, the district court, for reasons stated orally from the bench, granted Boden's motion in part and denied it in part. The court suppressed all statements made and evidence seized from the storage unit from 6:58 p.m. onward, the point at which Boden was advised of but refused to waive his constitutional rights. The court denied the motion as to the statements Boden had made before 6:58 p.m. and the items seized from his station wagon. We set forth the district court's reasoning in some detail because what the court found (and did not find) provides the framework for our analysis.

The district court first held that Boden had no expectation of privacy in the common areas of The Cedar Chest, though he had an expectation of privacy in his own storage unit. Thus, the agents' initial entry onto the premises did not implicate Boden's Fourth Amendment rights.

The court then held that the agents did not need probable cause to arrest when they first encountered Boden. Oitker's initial encounter with Boden, especially given that the two already knew each other, did not constitute an arrest, and the few questions which Agent Oitker posed to Boden did not amount to a custodial interrogation:

> [W]hen he entered into the premises Officer Oitker walked up to Mr. Boden ... and asked a few questions of him. Those few questions did not amount to a custodial police interrogation as defined in the *Miranda* decision.

The district court did not discuss where the other agents were at this time. In addition, despite the vivid testimony from Boden and DeVries about the agents toting guns, and the vigor in which Boden's counsel pressed that image in his closing argument at the suppression hearing, the court did not find that Agent Oitker or any other agent had pointed a gun at Boden or even drawn his weapon.

The court next held that Boden's response that he had "fireworks" justified further investigation, which would include frisking for a weapon and asking more questions:

> When Officer Oitker received the answers he received from the defendant in this case, substantially that he had had fireworks in his vehicle, Officer Oitker, who knew that Mr. Boden was a gunshop owner, had the right to detain on a temporary basis Mr. Boden for further inquiry. This detention at that time did not amount to an arrest.

Then, once Boden stated that he might have another gun in the car, Oitker was justified in searching the car, whereupon he came upon the sales receipt book:

> Officer Oitker had a basis to stop and frisk ... Mr. Boden, which he did. He found in Mr. Boden's right rear pocket a pistol. Finding the pistol, he then asked Mr. Boden a few more questions. Mr. Boden told him that there was a possibility of another weapon being in the motor vehicle.
>
> When Officer Oitker, hearing that, entered into the motor vehicle, he had a lawful right to do so. He also had the right while in that vehicle to make further observations of its contents, and probable cause at that point, having found the weapon in the possession of Mr. Boden, to search the interior of the vehicle and find incriminating evidence and to seize it.
>
> He had the right at that time to take the so-called sales book into evidence. He had the right to observe the interior of the vehicle and also to look into the contents of any boxes or packages contained within the interior of the vehicle.

Once, however, Boden refused to waive his rights, he did not consent to further searches and questioning.

After a bench trial on stipulated facts, the district court found Boden guilty as charged. The court placed Boden on probation for five years and ordered him to pay a $5,000 fine. He timely appeals the district court's partial denial of his motion to suppress.

## III. JURISDICTION

Jurisdiction in the district court was proper pursuant to 18 U.S.C. §§ 842(a)(1)

and 3231. Jurisdiction in this court is proper pursuant to 28 U.S.C. § 1291.

## IV. ANALYSIS

### A.

The Fourth Amendment guarantees a person's right "to be secure ... against unreasonable searches and seizures." If the agents violated the Fourth Amendment at any point from the time they first entered The Cedar Chest, then any confession they obtained and all evidence they discovered after and as a result of that Fourth Amendment violation must be suppressed as inherently tainted "fruit of the poisonous tree." *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 417, 9 L.Ed.2d 441 (1963). *See Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 1291–92, 84 L.Ed.2d 222 (1985). "The purpose of the Fourth Amendment exclusionary rule is to deter unreasonable searches, no matter how probative their fruits." *Elstad,* 105 S.Ct. at 1292.

Boden first contends that he had a protected privacy interest in The Cedar Chest's entire premises, even though he rented but one unit. As a result, Boden argues, the agents violated his Fourth Amendment rights when they entered onto the premises, thus compelling the district court to suppress any observations they made and all the evidence they obtained as a result of the entry. The district court, analogizing The Cedar Chest grounds to the common areas of a locked apartment building, concluded that Boden had no reasonable expectation of privacy in the area outside of his locker, and we agree. *See United States v. Acevedo,* 627 F.2d 68, 69 n. 1 (7th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 587, 66 L.Ed.2d 482 (1980). Therefore, the agents' initial warrantless entry into The Cedar Chest did not implicate Boden's Fourth Amendment rights. *See Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

■ Boden acknowledges that he did not expect that what he did in the facility's common area could be shielded from another tenant or those that tenant invited; anyone that another tenant designated in his application had access to the facility's common area. Conceivably, a tenant could designate law enforcement officers. In addition, on the date in question the gate was open. As Boden drove through on the way to his locker, he saw that the gate was broken; at least on that day anybody could come in. The complex did post a sign which warns that it would call the police if an unauthorized person came in, so if Boden could expect anyone in particular, it was law enforcement officers. Any expectation of privacy—or, more accurately, an expectation of security—rested if at all with the facility's owner, who could theoretically refuse admission to anyone he chose. *Cf. United States v. Swart,* 679 F.2d 698 (7th Cir.1982).

### B.

The parties agree that we should review the district court's fact findings under the clearly erroneous standard. *United States v. Talkington,* 843 F.2d 1041, 1045 (7th Cir.1988); *United States v. Santucci,* 674 F.2d 624, 631 (7th Cir.1982), *cert. denied,* 459 U.S. 1109, 103 S.Ct. 737, 74 L.Ed.2d 959 (1983); *accord United States v. Miller,* 800 F.2d 129, 133 (7th Cir.1986); *United States v. $73,277, United States Currency,* 710 F.2d 283, 288 (7th Cir.1983). "The Supreme Court has not been precise in stating whether a trial court's conclusion as to Fourth Amendment custody is a question of fact or a conclusion of law." *United States v. Ceballos,* 812 F.2d 42, 47 n. 1 (2d Cir.1987) (collecting Supreme Court opinions). Here, however, Boden's counsel agreed at oral argument that the district court's determination as to custody for Fourth Amendment purposes is a finding of fact subject to clearly erroneous review.[2]

---

**2.** Compare, for example, *United States v. Fuesting,* 845 F.2d 664, 671–72 (7th Cir.1988) (just as with other decisions regarding the admissibility of evidence, a district court's findings about whether a detention is an arrest or an investiga-

tory stop, and whether probable cause existed for a search, are subject to review only for abuse of discretion) with *Martinez v. Nygaard,* 831 F.2d 822, 826 (9th Cir.1987) (court of appeals should review *de novo* "ultimate holding"

The three items of evidence which the district court admitted and then relied upon in convicting Boden are: (1) Boden's initial statement to Agent Oitker that he had "fireworks" in the car; (2) the actual explosives seized from Boden's car; and (3) the sales receipt book seized from Boden's car. While "a district court is not required to make specific factual findings in a suppression hearing," *Talkington, supra,* 843 F.2d at 1048, a court must make enough findings to enable us to review the record "in a reasoned and meaningful manner." *Id.* The one finding we need to focus on is the district court's finding that Boden was not under arrest (or in custody) at the time that he told Oitker that he had fireworks. If that finding is not clearly erroneous then it was lawful to search his car in response to his statement that there were fireworks and to seize the sales book as a result of that search.

## C.

The encounter between Boden and the agents can be characterized in three ways: a consensual encounter (which does not involve the Fourth Amendment for no one is "seized"), an investigatory detention, or an arrest (both of which are Fourth Amendment restraints on liberty).

■ In holding that Boden was not under arrest, the district court did not specify whether the initial encounter between Boden and the agents was a mutually consensual relationship. To determine whether an encounter between a civilian and an officer is consensual, the key question is whether a reasonable person would have believed he was free to leave. *Michigan v. Chesternut,* ―― U.S. ――, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *$73,277, United States Currency, supra,* 710 F.2d

at 288 (7th Cir.1983); *Ceballos, supra,* 812 F.2d at 46. "[A] person is 'seized' only when, by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion by Stewart, J.). There is no "seizure" subject to the Fourth Amendment unless a reasonable person in Boden's position would have believed that he was not free to ignore Agent Oitker (and the other agents) and continue on his way; the test is objective. *See United States v. Notorianni,* 729 F.2d 520, 521–22 (7th Cir.1984). *Accord Michigan v. Chesternut, supra,* 108 S.Ct. at 1980.

"The determination whether an encounter between an individual and a law enforcement officer constitutes a 'seizure' is an extremely factual one, depending on the circumstances of each particular case." *$73,277, United States Currency, supra,* 710 F.2d at 288; *cf. Ceballos, supra,* 812 F.2d 42 at 47 (district court's determination as to whether defendant was "seized" is "entitled to *some deference* because the determination … is inextricably intertwined with the credibility of the witnesses."). This court has repeatedly suggested that a district court make a specific finding as to freedom to leave in the Fourth Amendment context. *United States v. Pavelski,* 789 F.2d 485, 489 n. 2 (7th Cir.), *cert. denied,* 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986); *United States v. Borys,* 766 F.2d 304, 310 (7th Cir.1985), *cert. denied,* 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986); *Notorianni, supra,* 729 F.2d 520, 523 (7th Cir.1984). Although the district court concluded that Boden was not arrested, the court did not make the specific finding that he was free to leave.

regarding whether there was "seizure" which violated Fourth Amendment while findings of historical facts are reviewed under clearly erroneous standard). The Eighth Circuit has articulated a standard which merges these two positions. Under that standard, if the district court's historical fact findings are not clearly erroneous, an appellate court will then affirm unless the decision " 'lacks the support of substantial evidence, it evolves from an erroneous view of the applicable law, or upon considering

the entire record we are left with a definite and firm conviction that a mistake has been made.' " *United States v. Pantazis,* 816 F.2d 361, 363 (8th Cir.1987) .(quoting *United States v. Lewis,* 738 F.2d 916, 920 (8th Cir.1984), *cert. denied,* 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985)). In almost all cases, including this one, the result will be the same under any standard, particularly because for the district court to apply "wrong" law is an abuse of discretion.

A close examination of the record may reveal that, based on the circumstances as they developed, Boden reasonably should have believed that he was free to leave. See *Ceballos, supra,* 812 F.2d at 47. We need not make that assessment here because the record clearly shows that Boden was properly subjected to an investigatory detention, commonly called a *Terry* stop. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

 A *Terry* investigative stop is a brief detention which gives officers a chance to verify (or dispel) well-founded suspicions that a person has been, is, or is about to be engaged in criminal activity. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 1879–80, 1883, 20 L.Ed.2d 889 (1968). "[B]ecause it is a lesser restriction on freedom of movement than an arrest, [it] is allowed on a lesser showing of cause." *Notorianni, supra,* 729 F.2d at 521. To justify this limited intrusion, the officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. at 1880 (footnote omitted). The officers may draw on their experience for their inferences from the facts they know. *Borys,* 766 F.2d 304, 308 (7th Cir.1985); *United States v. Pantazis,* 816 F.2d 361, 363 (8th Cir.1987). To determine whether an officer's suspicion of criminal activity is reasonable, a court must evaluate the totality of the circumstances. *Pavelski,* 789 F.2d at 489; *$73,277, United States Currency, supra,* 710 F.2d at 290 (citing *United States v. Cortez,* 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)).

We recently explained the reason for including an investigatory stop under the Fourth Amendment's umbrella:

> The reason for creating the intermediate category, the investigatory stop, is not merely the appealing symmetry of a "sliding scale" approach—though that is relevant, since it is common sense that if the Fourth Amendment is intended to strike a balance between the interest of the individual in being left alone by the police and the interest of the community in being free from the menace of crime, the less the interest of the individual is impaired the less the interest of the community need be impaired to justify the restraint. But beyond that, it is hard to see how criminal investigations could proceed if the police could never restrict a suspect's freedom of action, however briefly, without having probable cause to make an arrest.

*United States v. Serna–Barreto,* 842 F.2d 965, 966 (7th Cir.1988).

 Here, given the previous investigation and surveillance the Bureau had conducted, a *Terry* investigative stop and frisk was justified from the outset. Boden characterizes himself as a solitary figure loading unmarked boxes into his vehicle in a place where he lawfully had a right to be. But "[c]ommon sense and substance must prevail ..." *$73,277, United States Currency,* 710 F.2d at 290. By 6:30 p.m. on June 18, the Bureau had the following information:

1) Boden had previously dealt in illegal explosives and in fact had once pleaded guilty to illegally selling and possessing them;

2) An informant, Manella, told the Bureau that Boden was again selling explosive devices. Subsequently, other evidence corroborated that information's reliability;

3) During a conversation that morning at The Gun Lodge tapped by the Bureau, Boden had agreed to sell to Manella two cases of M–80 explosives. Boden and Manella were to meet at a prearranged location at 8 o'clock that evening. Thus, the Bureau *heard* Boden plan and commit to a crime;

4) At approximately 6:30 p.m., an agent in an airplane observed Boden carry boxes from his unit to the rear of his station wagon, which he had parked next to his storage unit;

5) Agent Oitker drove his car past Boden's and saw brown cardboard boxes in the storage unit.

For experienced agents, this was enough to reasonably infer that Boden was about

to transport and sell explosives and to justify *starting* a *Terry* investigation. To fall within the Fourth Amendment's ambit, however, the investigation also had to be reasonable in scope and duration. *Borys*, 766 F.2d at 309. *Terry* requires that a stop be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 88 S.Ct. at 1879. "The stop 'must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time.'" *Borys*, *supra*, 766 F.2d at 308 (quoting *Florida v. Royer*, *supra*, 460 U.S. at 500, 103 S.Ct. at 1325). Because of the pace of events at the time of the stop, we will not substitute our judgment for that of the officers as to the best methods to investigate. *Martinez v. Nygaard*, *supra* n. 2, 831 F.2d 822, 828 (9th Cir.1987).

■ Here, the government has satisfied its burden, *see, e.g., Pavelski*, *supra*, 789 F.2d at 490, of establishing that the contours of its initial *Terry* confrontation with Boden were reasonable. Oitker reasonably and sensibly asked Boden whether he was armed, frisked Boden when he responded that he had a handgun in his rear pocket and removed Boden's loaded pistol. Agent Oitker then asked Boden whether he had another weapon. All of these acts easily fall within the bounds of a *Terry* stop as necessary to protect the agents' personal safety and to maintain the status quo while seeking more information. *See United States v. Hensley*, 469 U.S. 221, 105 S.Ct. 675, 684, 83 L.Ed.2d 604 (1985); *see also Terry*, 392 U.S. at 29, 88 S.Ct. at 1884; *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972); *United States v. Davies*, 768 F.2d 893, 900–22 (7th Cir.), *cert. denied*, 474 U.S. 1008, 106 S.Ct. 533, 88 L.Ed.2d 464 (1985). And as part of his preliminary *Terry* investigation, Oitker reasonably asked Boden what the cardboard boxes in his car contained. *See United States v. Head*, 783 F.2d 1422, 1427 (9th Cir.) (drug agents permissibly asked *Terry* suspect whether he had drugs

in his vehicle), *cert. denied*, 476 U.S. 1171, 106 S.Ct. 2895, 90 L.Ed.2d 982 (1986). Thus, without more, the initial encounter did not exceed the bounds of a valid *Terry* stop at least up until the point at which Oitker entered Boden's station wagon.

### D.

Boden contends that he was placed under arrest when the agents initially approached him because they approached him with pointed guns. This arrest, according to Boden, was not supported by probable cause and therefore violated the Fourth Amendment. *See Dunaway v. New York*, 442 U.S. 200, 216, 99 S.Ct. 2248, 2258, 60 L.Ed.2d 824 (1979).

We construe the district court's findings as discrediting that account. In holding that Oitker's initial encounter with Boden did not constitute an arrest, the district court described how Oitker walked up to Boden and asked him a few questions. The fact that the district court did not mention pointing guns is significant, given the testimony from Boden and DeVries about the agents toting guns, and given the vigor in which Boden's counsel pressed that image in his closing argument at the suppression hearing. The striking differences between the competing versions of what happened show that the district court believed the agents. *See Saenz v. Young*, 811 F.2d 1172, 1174 (7th Cir.1987).

■ Thus, the district court correctly held that this investigatory stop never ripened into an arrest. A reasonable person in Boden's position would not have believed that he was under arrest. *See Martinez*, *supra*, 831 F.2d at 828. This conclusion is buttressed by the undisputed facts that the agents never transported Boden from the premises or even placed him inside one of their vehicles. *See, e.g., Hayes v. Florida*, 470 U.S. 811, 105 S.Ct. 1643, 1647, 84 L.Ed. 2d 705 (1985); *Dunaway, supra*, 99 S.Ct. at 2257–58; *Ceballos, supra*, 812 F.2d at 49.

### E.

Boden next challenges the warrantless search of his car and seeks to suppress the sales book and the 11 boxes and grocery bag containing explosives which were seized during that search. Subject to a few recognized exceptions, the Fourth Amendment does not permit an officer to conduct a search without a warrant. *See, e.g., United States v. Queen,* 847 F.2d 346, 352 (7th Cir.1988). Thus, during an investigatory stop, an officer generally may not search for evidence, *Michigan v. Long,* 463 U.S. 1032, 1049 n. 14, 103 S.Ct. 3469, 3481 n. 4, 77 L.Ed.2d 1201 (1983), except for evidence in plain view. *Hensley, supra,* 105 S.Ct. at 684; *United States v. Denney,* 771 F.2d 318, 322 (7th Cir.1985). Yet once Boden told Oitker that he had fireworks and perhaps another weapon in his car, Oitker's search in response to Boden's statements was lawful, and his seizing the sales book and the fireworks as a result of the search was lawful as well.

The district court held that Oitker lawfully entered the station wagon and had "probable cause" to search it. We agree. First, what Oitker did may be thought of as a search incident to a *Terry* stop. It is not disputed that Boden told Oitker that there might be a weapon in his car. Given that Boden was not under arrest and none of the agents were restraining him, Oitker had an articulable suspicion that Boden could gain control of a weapon. Therefore, Oitker could search in the passenger compartment for that weapon. *Michigan v. Long, supra,* 463 U.S. at 1049, 103 S.Ct. at 3481 (1983); *United States v. Denney,* 771 F.2d 318, 321–22 (7th Cir.1985); *United States v. Humphrey,* 759 F.2d 743, 748 (9th Cir.1985), *cert. denied,* 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 686 (1987). As the Supreme Court emphasized in *Long,* a *Terry* investigation " 'at close range,' " *Long,* 103 S.Ct. at 3482 (quoting *Terry,* 88 S.Ct.

at 1881) requires an officer to "make a 'quick decision as to how to protect himself and others from possible danger....' " *Id.* (quoting *Terry,* 88 S.Ct. at 1883). Therefore, officers are not required to "adopt alternative means to ensure their safety in order to avoid the intrusion involved in a *Terry* encounter." *Id.* Thus, while Oitker could have and in fact did move Boden away from the station wagon, there was still a continuing possibility that Boden could reenter it, as he was not under arrest.[3]

▬ While lawfully searching for the additional weapon, Oitker inadvertently discovered the sales book on the floor beneath the front seat. Oitker's seizing this sales book was lawful under the plain view exception to the Fourth Amendment's warrant requirement. *See, e.g., Moya v. United States,* 761 F.2d 322, 326 (7th Cir.1984).

▬ Second, a warrantless search of the entire car and inside the boxes was properly conducted under the "auto exception" to the warrant requirement. At least by the time Boden told Oitker that there were "fireworks" in the boxes in the rear of his car, Oitker had probable cause to believe that there were explosives in Boden's car. When an officer has probable cause to believe that contraband exists anywhere in a car, he can search for and seize it. *See, e.g., Michigan v. Long, supra,* 103 S.Ct. at 3481; *United States v. Ross,* 456 U.S. 798, 823–24, 102 S.Ct. 2157, 2172, 72 L.Ed.2d 572 (1982); *United States v. Mazzone,* 782 F.2d 757, 759–60 (7th Cir.), *cert. denied,* 479 U.S. 838, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986). Here, the Bureau had probable cause to search the entire station wagon, including the boxes, for explosives. *See Ross, supra,* 456 U.S. at 817–24, 102 S.Ct. at 2168–2172. In fact, Oitker would have been derelict not to search the entire car, as opposed to just seizing the packages in the back, given what he knew about

---

**3.** When the facts are read in the light most favorable to the government, Boden voluntarily consented to the search of his car. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). According to Oitker, Boden stated that he did not want the agents to think that he was armed with more

than the one gun, and "that I should go ahead and look for the other firearm to prove it was there or not there." By Boden's own version, by this time the agents had already put their guns away. The district court carefully distinguished when Boden refused to consent to a search of his locker later on, after 6:58 p.m.

Boden's trafficking in explosives and the deliveries to be made. *Cf. Mazzone, supra*, 782 F.2d at 762. In particular, Oitker was concerned that the explosives might detonate by accident, and he had the obligation to protect himself and others. With explosives, concern for public safety tilts the balance between the seizing and the intrusion decidedly towards the seizing. *See United States v. Perez*, 440 F.Supp. 272, 284 n. 35 (N.D. Ohio 1977), *aff'd mem.*, 571 F.2d 584 (6th Cir.), *cert. denied*, 435 U.S. 998, 98 S.Ct. 1652, 56 L.Ed.2d 88 (1978). In searching for the explosives, Oitker would have seen the sales book in plain view, for it was laying on the floor beneath the front seat.

### F.

Finally, independent of the stop's validity, Boden argues that the agents were required to advise him of his *Miranda* rights before asking him any questions. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Boden contends that even if he were not in "custody," he was "deprived of his freedom of action in a significant way," and this triggered *Miranda*'s requirements. Thus, Boden claims, as Oitker admittedly did not advise him of the *Miranda* rights before questioning him about what was contained in the boxes in his car, his answer to that question and all the information gleaned as a result of that answer must be suppressed.

Our holding that the agents' initial encounter with Boden was at most an investigative stop forecloses this alternative argument. In *Berkemer v. McCarty*, 468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), the Court held that a motorist temporarily detained in an ordinary roadside traffic stop was not "in custody" for *Miranda* purposes. 468 U.S. at 440, 104 S.Ct. at 3150. The Court reached this holding by making an analogy to a *Terry* stop:

> [T]he officer may ask the detainee a moderate number of questions ... to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond....

The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion to our opinions that *Terry* stops are subject to the dictates of *Miranda*.

468 U.S. at 439–40, 104 S.Ct. at 3150. *See United States v. Foley*, 735 F.2d 45, 47 (2d Cir.1984). Boden was not under arrest or in custody when he told Oitker that there were fireworks in his car. Therefore, the evidence admitted can not be suppressed on that ground, and the judgment of conviction is affirmed.

AFFIRMED.